### In re MILLER'S WILL.

(Supreme Court, Appellate Division, First Department. May 16, 1902.)

**1.** WILLS—TESTAMENTARY CAPACITY.

Where testatrix had during her lifetime personally managed her affairs, and was a woman of intelligence and force, and the question as to her testamentary capacity or otherwise, based on habits of intoxication, presented a close question of fact, with conflicting evidence of physicians, the question should have been submitted to a jury.

**2.** SAME—UNDUE INFLUENCE.

Where the evidence as to undue influence in the execution of a will shows that, though the nearest relatives were not consulted at the time of its execution and received but small bequests; they were not on pleasant relations with testatrix, and were in litigation with one of the family, who received a large bequest, and that the principal legatees were present before and after the execution of the will, down to the death of the decedent, the question of undue influence should have been submitted to the jury.

Appeal from surrogate's court, New York county.

Proceedings to settle the estate of Charlotte Miller, deceased. From a decree of the surrogate refusing to admit to probate the decedent's will (73 N. Y. Supp. 508), Justin Herold and another, the executors named in the will, and others, appeal. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Thomas Ewing, Jr., for appellants.

Theodore Sutro and William P. Maloney, for respondents.

O'BRIEN, J. Charlotte Miller, a widow about 56 years of age, having no children, died on the 2d of March, 1901, at 64 West Fortieth street, for many years her residence, leaving an instrument purporting to be her last will and testament, dated February 20, 1901, and disposing of property, real and personal, amounting to about $55,-000. The greater portion of her estate was given by it to Margaret Schultz, wife of William Schultz, who had previously been married

to Mrs. Miller's deceased sister. Minor bequests were made to William Schultz, to Julia Katzenstein, and to other "friends" of the decedent, while to each of two nieces, children of her deceased sister, she gave the sum of $500. Two servants received $250 each. The will explains in detail that Mrs. Schultz was made principal legatee because she had been a faithful companion and guide to Mrs. Miller, and because the relatives of the testatrix had neglected her. It further provides that William S. Katzenstein, husband of Julia Katzenstein, should be retained by the executors as their attorney. The executors included Mr. Kramer, father-in-law of Katzenstein, and Mrs. Miller's last physician, Dr. Herold. The latter, with Katzenstein, the two servants named in the will, and a third servant in the employ of Mrs. Schultz, were subscribing witnesses. The day after the signing of the will it was deposited with the probate clerk.

On behalf of the proponents, it was testified that the evening before the execution of the instrument, nearly all the legatees and witnesses being present at Mrs. Miller's house, the terms of the will were discussed, and Mrs. Miller, who was lying upon a couch, instructed Mr. Katzenstein as to its provisions; and that on the following morning he drew up and read to her a paper in words corresponding with her oral directions, and she assented to it as her will, and, seated at a table, signed it, and requested the others to sign, which they then did in her presence. The statements of the subscribing witnesses do not in every detail coincide; but, as said in Re Seagrist's Will, 1 App. Div. 617, 37 N. Y. Supp. 496, if they did "undertake to tell all that occurred in precisely the same order, each giving the same incidents as the others in precisely the same words, that fact would be of itself a suspicious circumstance." Here, moreover, it was not found by the surrogate, nor is it strenuously insisted by the contestants, that the necessary statutory formalities were not followed; and the testimony is that the decedent, not content with the signatures of her lawyer and physician as witnesses, requested and obtained the signatures of the three other persons.

The real attack upon the instrument offered for probate is that the decedent did not at the time of its execution possess testamentary capacity, and that she acted under duress. The evidence shows that Mrs. Miller had during her life personally managed her affairs, and was a woman of intelligence, strong personality, and force. In addition to her house on Fortieth street, which she conducted in part as a lodging house, she owned property at Mount Vernon, and, through the Second National Bank, was interested in other investments. She had been an active and successful litigant in a contest over a will in which she was a legatee, but some little time before her death had a falling out with the lawyer who had represented her interests. It was stated by the surrogate, and was not disputed, that down to June, 1900, she had perfect possession of her faculties. She had, however, during her life been addicted to drink, and her health was consequently impaired, and her physician, Dr. Kolb, had been and was in attendance upon her down to February 8, 1901. It is upon his testimony and that of an expert, Dr. Hammond, who at that time, through his intervention, examined Mrs. Miller, that

the contestants principally rely. These witnesses testify that Mrs. Miller exhibited all the symptoms of paresis, and claim that the disease being a progressive one, and practically incurable, she had, at the time they examined her, reached such a state that she could not thereafter, and when the will was signed on February 20, 1901, have had a lucid interval such as to enable her to make an intelligent disposition of property. They describe her tremulous manner and staggering walk, the enlargement of the pupils of her eyes, and, as the strongest evidence of her disability, assert that she was subject to hallucinations, and that on the night of February 6, 1901, she had an attack of this nature, and believed there were dead men in her room, and of this she told them on the morning of February 8th, when they examined her, and insisted as a fact that dead men were actually present. They also claim that another delusion at that time was that there were some quail in the house, which, in spite of the denials of the servant, she insisted should be sent to Mr. Schultz. Dr. Kolb states that he told Mr. and Mrs. Schultz of the serious and mentally feeble condition of Mrs. Miller, and, when he next called, was informed that he was not wanted. Although Mr. and Mrs. Schultz deny that they were told that Mrs. Miller was mentally unsound, it is undisputed that soon after February 8th they went to live in the same house with Mrs. Miller, and their physician, Dr. Herold, began attending her, and their lawyer, Mr. Katzenstein, was the one called to draw her will. It also appears that Mrs. Miller's nurse soon left, though it is testified that she did so upon her request, and another nurse, who had attended Mr. Schultz in an illness, came to the house a day or so after the will was signed. To meet the testimony of the physicians, Dr. Herold testified that, when informed of Dr. Kolb's decision, he examined Mrs. Miller for paresis, but concluded she was not suffering from that disease; that she improved under his treatment, and was not irrational or subject to delusions, and that the incident of February 6th was to be ascribed to temporary excessive drinking. This explanation is corroborated by others in the house, who say that Mrs. Miller drank heavily that day, and became drunk, but when undressed and put to bed calmed down, and the next day was all right. They further state that when Dr. Hammond called, two days later, she exclaimed that he was a mental expert, and asked why he had come. Another expert, Dr. Hamilton, who had not seen Mrs. Miller, testified, in answer to hypothetical questions, that she might have had sufficient mental capacity to act intelligently, and that the symptoms related would not necessarily indicate paresis, but might be the result of alcoholic indulgence. As to the alleged delusion regarding the quail, it was testified that there had been received a box of quail, and that day a messenger boy (who testified in person) was sent with some of them, not to Mr. Schultz, but to Mr. Erdman, a former lodger. Mr. Erdman testified that on February 14, 1901 (some days after Dr. Kolb concluded Mrs. Miller was hopelessly deranged in mind), he received as a birthday present from her some flowers, together with a note; and his letter in answer, dated February 15th, he identified, and also one he sent her February 7th. A florist testified that Mrs.

Miller called February 14th, and purchased the flowers. Dr. Herold further says that on February 12th, Lincoln's birthday, Mrs. Miller related to him some personal reminiscences of Lincoln. And the nurse who began attending her a day or two after the execution of the will testified that she recognized her as the nurse who, two years previously, had cared for "William" (Mr. Schultz). Although Dr. Kolb asserts that Mrs. Miller after August, 1900, showed various disturbances of the muscular system, including tremulous handwriting, twitching, etc., which increased up to February 6, 1901, we have in evidence a fac simile of a letter relating to her Mt. Vernon property, which she wrote, as testified, in November, 1900, and which is clear and concise, both in context and outline. It is also stated that in January, 1901, she actually went to Mt. Vernon.

There is other evidence in the record offered to show testamentary capacity, but we have given sufficient to show that there is presented a close question of fact, and one which, in our opinion, should be resolved by a jury. What has been said on this subject is applicable upon the question of undue influence. On one hand, we have the positive assertions· of the physicians of the contestants, and the many unusual and possibly significant circumstances connected with the making of the will, including its terms and phraseology; that it was immediately recorded; that the principal legatees were present before and after its execution, down to the death of the decedent; and that their own physician, attorney, and nurse appeared upon the scene. On the other hand, we have the equally positive testimony, both of physicians and laymen, that Mrs. Miller not only had lucid intervals but improved in health after February 8th, went on errands, and acted perfectly sane, and that many of the unusual circumstances are easily to be explained. Thus, although the nearest relatives were not consulted in the making of the will and receive but a small bequest, it appears that Mrs. Miller was not on pleasant relations with her two nieces, and that they were actually in litigation with their father, Mr. Schultz, who was on most friendly terms with the decedent.

Issues presented in this manner as to testamentary capacity and duress in a closely contested case, where the credibility of the witnesses and their bearing and manner of testifying are of great moment, are most satisfactorily disposed of by the determination of a jury. Upon a review of all the evidence, we are not entirely satisfied with the conclusion reached by the learned surrogate, and, as we are in doubt as to its correctness, we think this a proper case in which to refer the question for the determination of a jury. The principle which guides the appellate court in appeals of this nature is thus stated in Re Brennan, 21 App. Div. 236, 47 N. Y. Supp. 661:

"The question, however, in cases of this kind does not depend upon the consideration as to whether the surrogate might have found from the evidence that the will was the free and voluntary act of the testatrix, or that a jury might so find, but, rather, is it to be solved by a consideration of the whole evidence as a de novo question, and if, upon such consideration, the mind of the court is in doubt on the question of whether the will is the free and voluntary act of the testatrix, it becomes a question of fact for the

determination of a jury, and it is the duty of the court to set aside the probate, and direct a trial of the issues."

Upon the whole case, therefore, and in view of our not being satisfied that the conclusion of the learned surrogate is sustained by a preponderance of evidence, we think a situation is presented which makes it our duty to send the case back for a jury trial.

The decree herein entered, refusing probate, must accordingly be reversed, and a trial ordered before a jury, with costs to the appellants to abide the event. All concur.