(61 App. Div. 299.)

CHAMBERS et al. v. CHAMBERS et al.

(Supreme Court, Appellate Division, Third Department. May 8, 1901.)

WILLS—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

Testatrix was an aged lady, enfeebled in mind, and susceptible to in-
fluences. She had several aged brothers, for whom she ever had all the
affection of a sister. Several wills were executed by her, in which her
intention, as originally expressed, of giving a nephew, who resided with
her, a small legacy, was changed so that under the last will executed
such nephew received nearly all the property, and the provision for the
brothers and next of kin was reduced to about one-eighth of the estate.
Testatrix frequently expressed to her intimate friends her fear of her

nephew, and her declarations at different times before the execution of the will showed threats and importunities by such nephew. *Held* sufficient to show that such will was the result of undue influence exercised by such nephew, who was the principal beneficiary.

Appeal from special term, Warren county.

Proceeding by Henry Chambers and others against William G. Chambers and others to determine the validity of the probate of the will of Clarissa Ordway, deceased. From a judgment sustaining the will, and dismissing the complaint, plaintiffs appeal. Reversed.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

King & Angell (J. A. Kellogg, of counsel), for appellants.
C. H. Sturges, for respondents.

EDWARDS, J. This action was brought to determine the validity of the probate of the will of Clarissa Ordway, who died at Glens Falls, N. Y., on June 6, 1899. The will was admitted to probate without a contest by the surrogate of Warren county on the 7th day of August, 1899. The deceased left no husband nor surviving child, and this action was brought by her four surviving brothers and by other next of kin, claiming that the will is invalid by reason of mental incompetency of the testatrix and of undue influence. A joint answer was interposed by William G. Chambers, the principal beneficiary, by his wife and brother Halsey, and by the executor, denying the allegations of incompetency and of undue influence.

There is no question that the legal formalities required for the execution of a will were duly observed. Sufficient support is found in the evidence for the finding of the learned trial court that the testatrix was competent to make a will, but I am unable to concur in his conclusion that she was not under restraint nor undue influence. Want of testamentary capacity and undue influence are distinct grounds on which a will may be impeached. One may be competent to make a will, and yet under such restraint as to vitiate the instrument executed. The history of the testatrix, her mental and physical condition, her family relations, her surroundings, and the circumstances attending and preceding the execution of the instrument, are of much importance on the question of her freedom from restraint. The husband of the testatrix died in 1890, leaving no child, and giving to his widow real estate of the value of $10,000, $50,000 in personal property, and the income of $50,000 for life. She left an estate of about $60,000 in personal and $10,000 in real property. Shortly before her husband's death she returned to her home from a sanitarium, where she had been under treatment for the most of the time during the preceding ten years. Before those ten years she had been in a sanitarium at different times, usually from one to two years at a time. She was a confirmed invalid. Her physician, who attended her continuously from the time of her return from the sanitarium to her death, says:

"About the time I began to attend her, in 1889, she was very thin, spare, the skin covered the bones, hardly any flesh on her, * *. * weighing sev-

enty-five to eighty pounds. She remained about the same in physical condition during the time of my treatment of her. The nature of her physical infirmities was nervousness. Nervous prostration was the great trouble, with anæmia and general weakness."

During this period she had at two or three times severe illness, and a year before her death a stroke of paralysis. She required constant care and assistance, and much of the time was confined to her room. She was a woman of quite limited education, and read but very little. Just prior to the execution of the will in question her physician was in attendance upon her almost every day, and sometimes twice a day, and says of her mind at that time:

"My opinion as to the mental condition of Mrs. Ordway in 1896, in September, is that it was weak, and she was easily influenced. She could not stick to one thing long enough to carry it out. She was weak in her mind."

At the time of her death she was 84 years of age, and it is beyond question that during the 10 preceding years she was very feeble in mind and in body. Four sisters and two brothers died before the testatrix, who left, her surviving, four brothers,—John, Jeremiah, Dennis, and Henry, aged, respectively, 87, 78, 69, and 74 years. John was unmarried, Jeremiah had no family, Dennis had several children, and Henry one. Of the four deceased sisters three had been married and left children, and each of the two deceased brothers left children, one of whom was William G. Chambers, the principal beneficiary in the will, who at about 37 years of age went to live with Mrs. Ordway, shortly after her husband's death. Three of these surviving brothers were men of but very little means, and the other was in moderate circumstances. For these brothers the testatrix had until the time of her death the usual affection of a sister, and in her letters to them and otherwise she ever manifested a solicitude for their welfare. At some time after the death of her husband, and prior to December 27, 1891, a will was drawn by Judge Cherritree and executed by the testatrix. This will, the first that was executed by Mrs. Ordway, seems to have disappeared, and its contents are unknown, although the four subsequent wills drawn by Attorney Howard have been carefully preserved. The wills drawn by Howard were dated, respectively, December 27, 1891, June 9, 1893, August 28, 1895, and the one in question dated September 23, 1896.

Although the real question to be determined is the existence of undue influence at the time of and producing the will in question, the contents of the first of these four wills and the circumstances attending its execution are important in the consideration of that question, not only for the reason that that will is the basis for the subsequent ones, but it is claimed that the undue influence then had its inception and was continued with increased vigor to the time of the execution of the last will. Mrs. Barton, a nurse, says that she went to the office of Mr. Howard on some business on the 17th or 18th of December, 1891, and Howard stated to her that she "was just the person he wanted; that Mrs. Ordway wanted a nurse, and he was going to make her will, and wanted me to witness the will." She says:

"Mr. Howard told me that she [Mrs. Ordway] did not appreciate the difference between a nurse's salary and that of a domestic; that for me to take whatever they gave me and it would be all right. I was to stay only a short time, and what time I stayed I was to have $25 a week."

She went to Mrs. Ordway's on the following Saturday afternoon, about 2 o'clock, and at about 4 o'clock she had a conversation with Mrs. Ordway in regard to her will. She says that Mrs. Ordway stated to her that she was going to make her will, "and wanted Judge Brown to make her will, and Willie said she must have Howard. She wanted to know if I knew Mr. Howard. I said I did, and she wanted to know if he had been my attorney. I said he had, and I liked him." The person spoken of by this witness as "Willie," and thus familiarly referred to by the other witnesses in the case, is William G. Chambers, the principal beneficiary in the will, and the person who is claimed by the plaintiffs to have exercised undue influence over the testatrix. Mrs. Barton further says:

"I am very sure I told Willie she didn't know whether she would have Howard or Brown, and Willie said she should have Howard."

Mrs. Barton says that the next day, when "Willie" went home in the afternoon, Mrs. Ordway had her make a memorandum, and told her what to write, and had her make a copy to give to Howard. She says:

"She [Mrs. Ordway] told me, as to her will, to write down: Give Dennis Chambers $5,000, and each one of her brothers $5,000 apiece, and Willie $2,500, Halsey $2,500, Mrs. Shippey $2,000, I think,—I am not sure whether $1,000 or $2,000,—and Maggie Chambers $1,000."

She says that she named the furniture in different parts of the house; and "after that she wanted me to figure up and see how much it amounted to, and I did, and then she told me to subtract it from $49,500; that was what money she had; that she had borrowed $500 when Mr. Ordway died, and the balance of that money was to go to support the horses, and after the horses were dead it was to be divided among her brothers." She says she copied this memorandum for Mrs. Ordway at her request, and gave it to her. A copy of this memorandum, kept by Mrs. Barton, was put in evidence.

About a week after it was made Mr. Howard drew the first will, and the difference in testamentary intention as expressed in the memorandum and in the will are of unusual significance and importance. By the memorandum she gave to each of her brothers and to her sister Esther Chambers $5,000, to Willie Chambers $2,500, to his brother Halsey $2,500, to Clara Chambers $1,000, to Lottie Shippey $2,000, to Maggie Chambers $1,000, and the balance of the personal to be divided between her brothers, except certain articles of household furniture therein specified, and $200 which she gives to her niece Maggie Chambers; "the home to support the horses, then to my brothers and sisters." This was a natural disposition of her property, and such provision for her aged brothers as would reasonably be expected. In the will she gives to two of these brothers the same specific sums as in the memorandum; to the other two life estates in $5,000, with the remainder to the sons of Dennis; to the

sister Esther a life estate in $5,000, and the remainder to William G. Chambers; to Halsey Chambers the same as in memorandum; Clara Chambers is omitted; the amount to Laura Shippey changed from $2,000 to $200; the pecuniary legacy to Maggie Chambers is omitted; and to William G. Chambers, instead of to her brothers, is given her real estate and the residue of her personal, amounting in all to at least $36,000, instead of $2,500, as given to him in the memorandum. Mr. Howard, the attorney, and William G. Chambers are named as executors. Howard denies that he told Mrs. Barton he wanted her to go to Mrs. Ordway's to be a witness to her will, and says he did not employ her to go there, and did not know she was going before she went.

In this conflict of testimony it is not necessary for us to determine who is mistaken. There are, however, some undisputed facts and circumstances of significance and importance. It is not disputed that Mrs. Barton did have a talk with Mr. Howard; that within two or three days thereafter she did go as nurse in the employment of Mrs. Ordway; that neither Mrs. Ordway nor William G. Chambers was acquainted with her before she came there, and neither had previously employed her or knew that she was coming. It is undisputed that shortly after she arrived there she had this conversation with Mrs. Ordway with regard to her will, in which Mrs. Ordway told her that she wanted Judge Brown to make her will, and Willie said she must have Howard, and that Mrs. Barton spoke favorably to her of Howard; that Mrs. Barton thereafter told Willie she did not know whether Mrs. Ordway would have Howard or Judge Brown, and Willie said she should have Howard; and it appears, also, that Mrs. Barton was a witness to the will. Furthermore, the remarkable resemblance between the bequests of specific articles of household furniture mentioned in the memorandum and those in the will, and also between some of the legacies in the memorandum and those in the will, a copy of which memorandum was produced on the trial by Mrs. Barton before the production of the will, the contents of which Mr. Howard claimed were unknown to any person except himself, make it impossible to believe that the statement of Mrs. Barton in respect to the memorandum claimed to have been made at the dictation of Mrs. Ordway could have been the product of her imagination. The coincidences are too many to make it possible that her story is a fabrication. This sudden and marked change of the intention of Mrs. Ordway, in consequence of which the bulk of her property is diverted from her brothers, for whom she designed it, and bestowed on her nephew William G. Chambers, who was rendering services for hire to the testatrix, was wholly unexplained by the person benefited, and no reason for such change appears in the evidence.

As significant of the intervention of some person intermediate the making of the memorandum and the drawing of the will is the fact that Mrs. Shippey, who was at one time engaged to the testatrix's son, who died before his mother, was given in the memorandum $2,000 and in the will only $200, notwithstanding the continued tender regard of the testatrix for her. A reason for this change of

$1,800, which inured to the benefit of William G. Chambers, the residuary legatee, may be found in his declaration to Mrs. Barton, at the time this will was drawn, that "if he had anything to say she [Mrs. Shippey] would not get anything" under the will of Mrs. Ordway, and also to Miss Cayzer, another nurse, to whom he said that "he didn't want her [Mrs. Shippey] there, as she had undue influence over Mrs. Ordway." The desire of Chambers in regard to Mrs. Shippey seems to have been accomplished by the reduction from $2,000 given to her in the memorandum to $200 in the first will, to $100 in the second will, and the omission of her name entirely in the subsequent wills.

Of the subsequent wills of Mrs. Ordway and the circumstances attending their making the following is a brief history: In April, 1893, she stated to her nurse, Mrs. Barton, that she was going to make another will, and requested the nurse to make for her a memorandum and to keep a copy, which she did, and which was produced in evidence. As appears by this memorandum, the pecuniary legacies which she desired to make to her brothers and sister and to William G. Chambers and others are substantially the same as in the first memorandum, and the balance was to be divided between her brothers and sister, with some changes as to the specific articles of furniture. The will executed by her on June 9th, in respect to the pecuniary legacies, was entirely different from the memorandum, and gave to each of her brothers Dennis and Henry $4,000, instead of $5,000, as in the former will; increased the legacy of Halsey, the brother of William G. Chambers, $500; increased the sum in which her brother John was to have a life estate $1,000, and gave the remainder to William G. Chambers, instead of to the sons of her brother Dennis; increased the sum in which her brother Jeremiah was to have a life estate $1,000; and gave the residuary estate, real and personal, to William G. Chambers,—the result of which was that the amount given to him was increased over the former will by several thousand dollars. In her next will, dated August 28, 1895, the legacies to her brothers remained unchanged, but the remainder of the legacy of $6,000, in which her brother Jeremiah had a life estate, was given to William G. Chambers, instead of to the sons of her brothers Dennis and Henry. On the last day of August, 1896, a few days before the execution of the will in question, she contemplated making a new will, and had her physician, Dr. Little, make a memorandum of the dispositions she desired to make of her property, and said she wanted to give each of her four brothers $10,000, Mrs. Shippey $1,000, Nellie Snyder $100, and to William G. Chambers the place and $5,000, and said that was the way she was going to make her will. On September 23, 1896, the will in question was made, making a disposition of her property wholly different from that expressed in the memorandum, and different from that in the previous will, in that she reduces the legacies to each of her brothers Dennis and Henry from $4,000, as in previous will, to $3,000; gives same life estate to her other two brothers, with remainder to Willie, the same legacy to Halsey, brother of William, and two legacies of $100 each; and, except the specific bequests

of furniture, jewelry, and apparel, gives the residue of her real and personal property to William G. Chambers, thereby increasing the amount given to him over the last preceding will.

The result of these various wills was a change in the originally expressed intention of the testatrix to give Willie $2,500, by giving him under the first will over $36,000, which amount was gradually increased to the last will, when he received nearly all of the property of the testatrix, while the provisions for her brothers, for whom her affection was stronger than for William, and for her other next of kin, was gradually reduced to nearly one-eighth of her estate. It was said by Church, C. J., in McLaughlin v. McDevitt, 63 N. Y. 217:

"A testator has, of course, a right to change radically and arbitrarily the manner of disposing of his property, and, in the absence of fraud, courts will sustain his action in this respect; but when, according to the ordinary motives which operate upon men, we find an unnatural change made in a sick man's will, and one apparently contrary to his previous fixed and determined purpose, it is the duty of courts to scrutinize closely the circumstances, with a view of ascertaining whether the act was free, voluntary, and intelligent."

It is extremely improbable that, if there were any reasonable explanation for the change of testamentary intention, the person benefited by the change, who was charged with the exercise of undue influence, and who manifestly had motive, opportunity, and disposition to effect a change, would have wholly omitted to give any explanation. This omission is a very important circumstance bearing on the question of undue influence. Tyler v. Gardiner, 35 N. Y. 559; Marvin v. Marvin, 3 Abb. Dec. 201; McLaughlin v. McDevitt, supra. The evidence abounds in declarations, made by the testatrix at different times before the execution of the will to her confidential friends, of the threats and importunities of William G. Chambers, the principal beneficiary. While the statements of a testator are not competent evidence of the facts stated, they are admissible on the question of his mental condition at the time of the execution of the instrument, and affect the question of undue influence so far as it is involved in the question of mental condition. "They are also competent as bearing upon the condition of the testator's mind with reference to the objects of his bounty. They may be given in evidence for the purpose of showing his relations to the people around him and to the persons named in his will as beneficiaries." Waterman v. Whitney, 11 N. Y. 165, 62 Am. Dec. 71; Marx v. McGlynn, 88 N. Y. 374; In re Clark, 40 Hun, 233.

We can here group a few only of these declarations. To her intimate friends she frequently expressed her fear of "Willie," as she called him; said she did not discharge him "because she was afraid of him; that he would do something desperate; that she would be in ashes." Her friends sometimes found her sobbing and crying. She said that "she and Willie had been having trouble; that he had been cursing and swearing at her." One witness says she heard "Willie" swear at Mrs. Ordway. She said that "she would say 'Yes' in order to prevent a fuss"; spoke about her brothers coming there, and said "he didn't like to have them come for fear she would leave them money." The nurse says that on going into the room of Mrs.

Ordway after her interviews with "Willie" she "observed something unusual in her condition; she was often prostrated; she was very nervous and prostrated, and she would have to give her restoratives, and Mrs. Ordway would say that "Willie" had been scolding her; that "Willie" said she was "the damnedest most deceitful person and biggest liar he ever saw, * * * and her sickness was a judgment upon her, and that God would never let her get well." To her physician she said that "Willie wanted she should give him all the money; that he had taken care of her; that he was the only friend she had,—the only one that had paid her any attention"; that "Willie made it very unhappy for her when she gave money to her brothers, as he didn't want she should do it." These are the declarations of a person unquestionably feeble in mind and readily susceptible to external influence. Independent of their truth or falsity, they disclose her fear and apprehension of "Willie," and a state of mind towards him that renders the belief almost impossible that the bestowal of the bulk of her property on him was in accordance with her unrestrained wishes. From all the evidence in the case it clearly appears that in making him her principal beneficiary she was neither inspired by affection nor moved by gratitude for unrequited services.

Among the declarations of the testatrix is a very remarkable letter, written by her to her brother on February 16, 1896, about six months after the execution of the will of 1895, of which the following is a copy:

Glens Falls, February 16th, 1896.

Mr. Henry Chambers
  Dear Sir
  After Clarissa Ordway is Desese or tacon a Way & thay is eney prospect of a Suite You can Suppeney Mrs. Minney Bartelet of Glens Falls My Nurse Mrs. Wilumson Dr. Littlefield Daughter Nellie Snyder of Saratoga Co. Mrs. Wilcox of Glens Falls
  Mary Ordway Nursed When sick in the year 1895 the last of August She Was hear 19 Days I paid $40 Dollars You Can Call on them thay Wer all hear at the time he was they Can tell all you Like to No.

Friend Chambers.

While the purpose of this letter is somewhat conjectural, it is by no means improbable that, with a consciousness that she had been coerced into the making of a will against her manifest wishes, which worked an injustice to her brothers, for whom she still had a deep affection, she was inspired by a desire to secretly communicate to them the cause of this unnatural disposition of her property and the sources from which they might obtain information of the influences that had controlled her. It is true, according to the testimony of Mr. Howard, the attorney who drew the will, and of the subscribing witnesses, that the testatrix understood and assented to the provisions of the will, but this is not a sufficient answer to the charge of undue influence. "This was the precise purpose which the undue influence was employed to accomplish." Tyler v. Gardiner, supra. The coercion of the will of another is exercised in divers ways and by divers methods. It is a species of fraud which is not usually perpetrated openly, but by secret and cunning contrivance, and its existence "must be decided by the application of sound principles

and good sense to the facts of each given case." Rollwagen v. Roll-wagen, 63 N. Y. 519. "It is impossible to define or describe with precision and exactness what is undue influence. * * * But the influence exercised over a testator which the law regards as undue or illegal must be such as to destroy his free agency; but, no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it. It is said in 1 Jarm. Wills, 36, 'that the amount of undue influences which will be sufficient to invalidate a will must, of course, vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired.'" Rollwagen v. Rollwagen, supra. In this case there is but little direct evidence of the exercise of undue influence. But such evidence is not essential. It is rare that a case is susceptible of such evidence. It is only necessary that facts and circumstances be shown from which undue influence is a reasonable inference. Tyler v. Gardiner, supra; Marvin v. Marvin, 3 Abb. Dec. 201; McLaughlin v. McDevitt, supra; Rollwagen v. Rollwagen, supra. In the case last cited it was said by the court, in commenting upon evidence of undue influence:

"It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

The application of the foregoing principles to the facts of this case produce a clear conviction that the instrument in question was the result of undue influence exercised upon the mind of the testatrix by William G. Chambers, the principal beneficiary. All of the facts and circumstances converge to that conclusion. The evidence clearly shows the enfeebled mind of the testatrix, which made her readily susceptible to such influences; the unnatural disposition of her property in withholding it from her needy and aged brothers, for whom she ever had all the affection of a sister, and bestowing almost her entire property upon one of several nephews, to whom she was under no special obligations and whom her declarations show she feared; and a decided and unnatural change in the will from her previous fixed purpose, without any explanation whatever of such change by the person benefited, who was directly charged with the exercise of improper influences over the testatrix, and whose motive, opportunity, and disposition to effect a change were manifest. The language of the court in Delafield v. Parish, 25 N. Y. 95, may be repeated as especially applicable to the facts and circumstances of this case. It was there said:

"But when such is the array of circumstances, when such a result is attained without any more substantial apparent cause, we are justified in saying, from the evidence, that the only cause to be inferred which is in the least degree adequate to produce the result is a long-continued, persistent, overpowering influence, to which his condition rendered him peculiarly sub-

ject, and which she was as peculiarly in a position to exercise. Such a disposition of property we are not bound to sustain."

I am convinced that, while the instrument in question is in form the will of Mrs. Ordway, it is in fact the will of William G. Chambers, and for this reason the judgment should be reversed, and a new trial granted. All concur.