### In re CRUMB'S ESTATE.

(Surrogate's Court, Madison County. January, 1911.)

1. WILLS (§ 120*)—ATTESTATION—REQUEST BY TESTATRIX—SUFFICIENCY.
   A testatrix's request that certain persons attest her will applied to any will subsequently signed by her before them.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 314–317; Dec. Dig. § 120.*]

2. WILLS (§ 156*)—EXECUTION—UNDUE INFLUENCE—ESSENTIALS.
   Incompetency preventing a testator from resisting importunity is essential to undue influence which will invalidate his will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 382; Dec. Dig. § 156.*]

3. WILLS (§ 54*)—EVIDENCE—TESTATOR'S DECLARATIONS.
   Neither written nor verbal declarations by a testator are evidence of the facts stated, but they are competent upon an issue of his mental status during the period within which they were written or uttered.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 131–134; Dec. Dig. § 54.*]

4. WILLS (§ 164*)—UNDUE INFLUENCE—EVIDENCE—TRANSFERS BEFORE DEATH.
   On an issue of undue influence over a testator, transfers of property shortly before the will was made should be considered in connection with execution of the will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE—WEIGHT.

    Evidence in a will contest *held* to show that undue influence was not exercised over testatrix.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

In the matter of the estate of Sarah M. Crumb, deceased. Proceedings by Jane Wiggins to revoke probate of decedent's will. Proceedings dismissed.

Davis & Lusk, for petitioner and others.
Eugene A. Rowland, for Seamans and Smith.
C. H. Hitchcock, for Russell.
A. E. Fitch, special guardian, for King infants.
Harlan D. Preston, special guardian for Reed and Steves infants.
John T. Gardner, special guardian, for Whaley infant.
J. T. & C. H. Gardner for special guardian and others.

KILEY, S. On May 23, 1906, Sarah M. Crumb, the above-named testatrix, was about 80 years of age. On that date she signed what purports to be her last will and testament. Four witnesses subscribed their names and post-office addresses to the instrument at the time she signed her name. On September 25, 1908, she died. On January 8, 1909, the above-mentioned will was admitted to probate, without objection, by a decree of the Surrogate's Court of Madison county which court had jurisdiction thereof. On January 3, 1910, a petition was filed under the then existing law by Jane Wiggins, sister of the testatrix, asking for a revocation of the probate of said will. The grounds alleged in the petition are the usual grounds: Failure of execution; lack of testamentary capacity; fraud and undue influence. The issues thus presented were controverted by the proponents. A long trial was had. The record contains 1,425 typewritten pages, besides voluminous documents put in as exhibits by both sides. Hereafter, in this memorandum, for convenience, those seeking to sustain the probate will be designated as proponents; those seeking to overthrow the will contestants.

Sarah M. Crumb resided at De Ruyter, this county, the widow of Joseph H. Crumb. Her husband predeceased her by many years. He left her his property, and at his death she was worth about $70,-000, all of which came from Mr. Crumb by gift before death and by will at death. She nor her immediate family, so far as the record shows, never possessed large properties by virtue of their own exertions or accumulating faculties. The property left by Joseph H. Crumb was about one-third personal and two-thirds real estate, the latter largely made up of farms in and about the township of De Ruyter, N. Y. Mrs. Crumb was one of 11 children, of which, as I understand from this record, one brother, De Volson Smith, and two sisters, Amy Smith and Jane Wiggins, survive. Mrs. Crumb's maiden name was Smith.

The first issue tendered by the contestants is the insufficiency of the execution of the will. It may be taken as proved that the testa-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

trix signed her name before the signatures of the witnesses were affixed to the instrument. To this extent the difficulty encountered in Jackson v. Jackson, 39 N. Y. 153, is avoided. The conditions existing in case of Burke v. Nolan, 1 Dem. Sur. 436, do not exist here, in that the testator was in extremis, and no claim is made that he acknowledged after execution. In this case testatrix was up and dressed, sat at a table in a room which was used as a dining room and library. Troup v. Reid, 2 Dem. Sur. 471, follows the rule which seems to obtain at the present time. The will in question was signed by four witnesses. The witnesses, Coon, Smith, and Murray swore that they were asked by testatrix to sign her will as witnesses. The contestants claim that these requests so long antedated the execution of the will that it should not be held as a matter of fact that it was the same will they signed as witnesses. I cannot find that this question has been heretofore raised, and am inclined to think that her request would apply to any will that she subsequently signed before these same witnesses. It was for her to say what will she would finally execute. As they signed only one before her as witnesses, her request could not apply to any other. The only question remaining is, Was it published? Two witnesses, Dr. Coon and Ira Smith, swear that in reply to Dr. Coon's question she said it was her last will, and she desired them to sign it as witnesses.

This presents a state of facts to be passed upon, not a question of credibility of witnesses, because none swore positively that she did not state it was her will. We have not the situation where all of the witnesses do not recall the publication, or where any of the required number swear positively that the requirements of the statute were not substantially observed. This feature distinguishes this case from many of those cited by contestants, and, while, there is nothing to spare, I find that the necessary requirements of the statute were observed. In making this finding I am not unmindful of the provisions of section 2588 of the Code of Civil Procedure, and the holding in Matter of Laudy, 148 N. Y. 403, 42 N. E. 1061, and hazard the observation that, no matter which way this contest is decided, upon an appeal it would be sent back for a jury trial.

This situation arises somewhat from the fact that all surrogates have the tendency, and growing propensity, to uphold testamentary dispositions; not consciously, but unconsciously they lean toward the idea that he who has property, and gives it away, should be allowed to do as he desires with that which he has earned, accumulated, or saved. This feeling is not confined to surrogates. We find the Court of Appeals laying down the rule in Clapp v. Fullarton, 34 N. Y. 197, 90 Am. Dec. 681:

"The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasonings. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust."

We now reach the second ground urged by the petitioner why the probate of this will should be revoked, viz., lack of testamentary capacity. If this issue stood alone and free from the one that fol-

lows, viz., fraud and undue influence, it would not be difficult of a correct solution. We are bound by the rule laid down by the Court of Appeals early in its history and followed to the present day, as traced in the following decisions: Delafield v. Parish, 25 N. Y. 9. "A testator who has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been, the objects of his bounty, and the scope and bearing of the provisions of his will, is a person of sound mind and memory within the meaning and intent of the statute of wills." Horn v. Pullman, 72 N. Y. 269. Holds substantially it cannot be inferred from an enfeebled condition of mind or body that such a rule would be dangerous in the extreme, that the laws wisely sustain testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is testator's free act, and he has sufficient intelligence to comprehend the condition of his property and the meaning and scope of the provisions of his will. To like effect and tenor are Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302; Pringle v. Burroughs, 185 N. Y. 375, 78 N. E. 150. But this issue of incompetency cannot be entirely separated from the issue raised as to fraud and undue influence.

Mrs. Crumb at the time of making this will was about 80 years of age. She was feeble in both mind and body. The result was not only of old age, but in the latter part of her life she passed through frequent and severe periods of sickness, so that at the date of making this will her former naturally strong constitution and vigorous mind was well overthrown. Notwithstanding these conditions, the record shows, without contradiction, that she kept her grasp upon a multitude of business matters down to near the time of her death, over two years after the will was executed. Undue influence, as made out by the contestants, with the rules of evidence applicable to the state of facts adduced, is the chief cause urged for the revocation of the will. Without incompetency to an extent that it takes away the power of the testatrix to resist importunity, the issue cannot be successfully urged and sustained. In Matter of Snelling, 136 N. Y. 515, 32 N. E. 1006, the court says:

"What the law terms undue influence is not established by proof tending to show that the testator acted from motives of affection or gratitude, though the objects of his bounty were strangers to her blood. The influence or moral coercion, or by whatever other term designated, must be such as to overpower the will of the testator and subject it to the will and control of another, in which case it assumes the character of fraud."

In Matter of Donohue's Will, 97 App. Div. 205, 89 N. Y. Supp. 871, the court says:

"While the courts should see that the testamentary act is freely exercised by the aged, weak, and infirm without restraint, force, or fraud, so as to promote their own comfort and enjoyment, and should guard and protect them with the greatest care and circumspection from imposition and improper influence, they should hesitate to find that undue influence had been practiced, or that a testator was of unsound mind, where a will is fair and reasonable, according to the common instincts of mankind, and such as might, with propriety and justice, be made by a decedent."

In Matter of Smith, 95 N. Y. 516, Mr. Justice Andrews says:

"Undue influence, which is a species of fraud, when relied upon to annul a transaction inter parties, or a testamentary disposition, must be proved, and cannot be presumed. But the relation in which the parties to a transaction stand to each other is often a material circumstance, and may of itself in some cases be sufficient to raise a presumption of its existence."

Later in the same opinion the learned judge says the rule adverted to above does not apply in all its strictness to gifts by will. In the Matter of the Will of Budlong, 126 N. Y. 423, 27 N. E. 945, the court approved of the principle laid down in 1 Redf. on Wills, as follows:

"But gross inequality in the disposition of the instrument, when no reason for it is suggested either in the will or otherwise, may change the burden and require explanation on the part of those who support the will to induce the belief that it was the free and deliberate act of a rational, self-poised, and clearly disposing mind."

In Rollwagen v. Rollwagen, 63 N. Y. 504, the court says:

"The influence exercised over a testator which the law regards as undue or illegal must be such as to destroy his free agency; but, no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it."

The same court holds that undue influence can be shown by circumstances surrounding the testator, the nature of the will, his family relations, condition of health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declarations of such person. In Chambers v. Chambers, 61 App. Div. 299, 70 N. Y. Supp. 483, Judge Edwards, writing for the court, says:

"Want of testamentary capacity and undue influence are distinct grounds on which a will may be impeached. One may be competent to make a will, and yet under such restraint as to vitiate the instrument executed."

This is not in conflict with the observations heretofore made herein, that some weakness of mental faculties must exist, from natural causes or otherwise, so that the testator is unable to successfully oppose the will against whose influence he is striving. In the case at bar it is reduced to this proposition. Mrs. Crumb was competent to make a will. Was the influence of Amy Smith and Ezra Seamans, the residuary legatees, such that it prevented her making the disposition of her property that she desired or would naturally desire to make? In Chambers v. Chambers, supra, the judge follows the rule as above stated by him, with the following pertinent suggestions:

"The history of the testatrix, her mental and physical condition, her family relations, her surroundings and the circumstances attending and preceding the execution of the instrument are of much importance on the question of her freedom from restraint."

The contestants' proof of undue influence is largely made up of declarations, verbal or written, of the testatrix. I think it is a well-settled rule that neither the written nor verbal declarations can be

127 N.Y.S.—18

taken as evidence of the facts stated, but are competent upon the question of the mental status of the testatrix, and as showing the state and condition of her mind during the period within which they were written or uttered. Amy Smith was a sister about 10 years younger than Mrs. Crumb. Ezra Seamans married a daughter of Edward Smith, who was a brother of Mrs. Crumb. Amy had lived at De Ruyter, N. Y., with Mrs. Crumb for upwards of 20 years before her death. Seamans never resided at De Ruyter, but resided at East Pembroke, N. Y., a place a few miles from Batavia, N. Y. The evidence shows: That Mrs Crumb had been afflicted with liver trouble for several years before her death, and in 1903, and again in 1904 and 1905, had severe attacks of pneumonia. That arterial sclerosis had set in, and at the time of the making of the will she was in a run down physical condition, somewhat mentally impaired, and that she never fully recovered from the effect of these several periods of illness. The sister Amy, with the assistance of friends and day help, took care of Mrs. Crumb, except the occasion of her illness in the spring of 1905, when a professional nurse was in attendance. That at the time the will was executed she was under the care of her physician. That the sister Amy dominated the life and mental powers of the testator for some years before her death, and that it so appears from uncontradicted and uninterested evidence is strongly urged by the contestants. Briefly alluded to, that evidence is as follows: Dr. Monroe testifies that Amy caused his discharge because of the expense, giving as one of the reasons the expense of the oxygen. Amy does not deny it, although she could have done so and violate no rule of evidence. That Amy prohibited and compelled the discontinuance of the visits of Mr. and Mrs. Howes, who were warm personal friends of Mrs. Crumb. This Amy admits. Ella Vincent testifies of two occasions in the year 1906, when Mrs. Crumb met Mrs. Howes at her home, and kissed her and showed grief. Dr. Monroe testifies further that after his discharge Mrs. Crumb, if alone, always saluted him; but when Amy was present never recognized him; that the conversation with Jane Wiggins when she went to De Ruyter to see Mrs. Crumb, and which was claimed to be overbearing and tyrannical, Amy does not deny, although she might have done so and not violate any rule of evidence. Elmer Craft, a tenant upon one of the farms, came there to settle for the milk and render an account of the feed used upon the farm. That Mrs. Crumb had the feed bills in her hand. That Amy came into the room, took them away from her, and said: "You do not understand doing business." That Mrs. Crumb looked grieved. This was in the fall of 1905 or 1906. That Mrs. Crumb had some money for Mrs. Killeen to take to Cortland. When she went to the house, Amy was in the room. After Amy went out, Mrs. Crumb took an envelope containing the money out of the bosom of her dress, and gave it to witness. That at another time when Mrs. Crumb was sick witness was alone with her, put a pillow to her back and got her some handkerchiefs at her request. That Amy came into the room, took the pillow and handkerchiefs away from Mrs. Crumb, and put them back. Mrs. Crumb said nothing. Amy does not deny it. She could have done so without violating any rule of evidence. Same witness

testifies to going by the house and seeing Mrs. Crumb sitting on the porch crying, and on more than one occasion. That the proceeds of bonds sold $10,400, were placed in the names of Ezra and Amy. This was in May, 1905. Sadie Bristol testifies that Amy took the mail which she brought from the post office away from Mrs. Crumb before she could read it, and afterwards instructed her not to give it to Mrs. Crumb, but to put it on a shelf in the kitchen. Amy does not deny it, although she could have done so. That from the time this will was executed in May, 1906, Mrs. Crumb was continually under the eye and control of Amy Smith, and part of the time Ezra Seamans. That he commenced to come to De Ruyter about the time of the death of a sister, Mary Walker, in December, 1903. That from that time, or soon after, he and Amy were the only ones who had the confidence of the testator. That he attended to the transfer of the bonds, invested the money in his name as trustee without any known authority, paid Dr. Monroe, was around De Ruyter considerable periods during the intervening years, procured his own attorney to draw the will, and attended to its execution. When Mrs. Wiggins was allowed to go into the room to see Mrs. Crumb, who was sick, he was there, did not speak to her, and did not leave the room. He does not deny it. He could have done so without violating any rule of evidence. That the will names him as one of the legatees, and his two children were remembered.

The evidence of Mr. and Mrs. Howes as to what they heard Amy say, tell her to stop crying, and that she run this house, etc., is not denied. It could have been, if it was not a fact. This evidence was severely criticised by proponents' counsel. I do not agree with them in that censure. Mrs. Crumb had the right to make the bargain with Mr. Howes which he claims she made, provided she was competent, and that he did the work is urged by proponents, namely, the contract with reference to the Morgan letters. Mr. Howes had the right to show them to Mr. Seamans as evidence of his employment, and many of the facts testified to by Mr. and Mrs. Howes is borne out by independent and disinterested testimony. The contestants urge: That the verbal declarations of Mrs. Crumb to different persons shows, so far as Amy is concerned, that her state of mind was that of abjectness. That in May, 1906, she said to Charles Howes that Amy and Ezra had taken all of her property away from her. That Amy took all of the dividends, and that, if she got any money, she had to steal it. That she was crying and sobbing. Mrs. Howes was present. That she told Mrs. Howes that Amy had forbidden her to speak to her. That she could not write a letter without showing it to Amy. That Amy's will power was stronger than her's. That she asked witness to get her stamps and paper. Amy would not let her have any. That on one occasion she told Dr. Monroe, in absence of Amy, that it was due to him and the nurse she was alive, and within 24 hours countenanced his discharge in the presence of Amy because she was not getting along fast enough. That in the absence of Amy she said she wanted to see her sister Mrs. Wiggins, and within a day or two in response to Amy's statement, "You don't want to see your sister," said "No." That she would sometimes cover her face with her hands.

That she told Ella Vincent she wanted to see Mrs. Howes, but Amy would not let her. That Amy was not willing she should help the pastor. That in 1904 she told Charles Howes that Amy wanted her property. That she would not let her give him or Betsy Russell beef, wanted to give him a willow rocker, but Amy would not let her. That he heard Amy say that if she, Mrs. Crumb, did not turn the nurse and doctor out, she would. That Amy said to Mrs. Howes in May, 1906, that she run things at the house there. That she saw and heard Mrs. Crumb on the porch crying and sobbing.

The written declarations of the testatrix upon which contestants rely are largely contained in letters from a Dr. Morgan. This man was upwards of 30 years her junior. He was and is a traveling showman and vendor of patent medicines. The evidence shows that 12 or 15 years before Mrs. Crumb's death there was conceived in her and by her an intense infatuation for Dr. Morgan. He was a married man. One of his letters to her written in 1904 is in evidence, and from that and his evidence upon the trial it would appear that he held her in somewhat affectionate regard. Each of those letters show, if taken as correctly representing her condition of mind, that for some reason she was limited by those around her, Amy most of the time, in the free expression, tendencies, and operation of her will, and her desire as to the control of her property and individual action and freedom. A few quotations from the Morgan letters will indicate what is claimed for them as showing her condition of mind:

December, 1905:

"My diamonds are all gone they took them when I was like a dead woman and didn't know what was going on if I say anything you havent any use for such things what do you want of diamonds,—Hadnt ought to go to you with my troubles havent anybody else but you."

September, 1906:

"O my God I cant begin to tell you half that I have suffered I am like a prisoner in my own house if things go on much longer I will go to the old ladies home at Oneida I dont have a word to say, have lived to long and used to much money."

December 22, 1906:

"It is most Christmas, no bright spot for me. Mr. and Mrs. Howes is very good to me but I cant see them my sister wont let me she is my sister but so ugly she treat me worse than a dog I can have any privilege in in my own house."

August, 1907:

"You spoke of a chair, if I had one friends would come and get me, If I had been poor as a church mouse it would have been different. it was my money my people wanted they dont want me to use any for my comfort."

December, 1907:

"Your letter handed me friday night, couldnt get a chance to read it until Saturday. I cant write unless my sister ask who I am writing to and if she found out it was you she would turn the house inside out. You dont know what a life I live, my once happy home isnt home to me now I cant have anything as I want it my friends isnt welcome to come and see me as they used to be."

September, 1907:

"I tried to write you but couldnt I am watched so close, not a cent am I allowed to handle I pray every night for death to come and take me away from my once happy home. * * * I once had a happy home I never thought it could change so but such is life."

January, 1907:

"My sister watches me so I cant do one thing that she dont know of,— None of my friends can call on me without she comes in to hear all that is said.—Christmas time,—I had—presents * *. * I didnt have the privilege of opening a box for fear it might be from you,—O it hurts to be treated so in my own house."

April, 1907:

"I am writing under difficulties for I am watched every minute and am asked who I am writing to."

November, 1907:

"Would like to have you run up the De Ruyter but it cant be I would not be allowed to see you."

In the month of September, 1907, she wrote Mr. and Mrs. Howes that she had heard they were going to move to Syracuse, and said:

"Oh. how I would like to have a good visit you but dont never expect to I am a prisoner in my own house dont have anything to say about my own business it is to bad if I had died when I was sick it would better all around."

The proponents meet this evidence and claim to neutralize its force, if not completely answer it, with proof of her declarations both oral and written, which are diametrically the opposite of that last quoted. Briefly it is as follows:

Lena Spaulding, after the recovery from her 1905 illness:

"I think it was after that she told me how good Amy was to her; she made a regular baby of her taking such care of her."

Ella Wheeler, both 1906 and 1908, visited with Mrs. Crumb:

"That Amy was to be well remembered. * * * That she had deeded the house and all that was in it. * * * Had given her a bill of sale of every article. * * * She was deserving of it, always treated her so kindly. She did not know what she would have done without her, was wholly dependent upon her, nobody else took the care of her that Amy did; also the farm that she had deeded to her. * * * That she had made provision for her she would be getting the good of it while she was alive. * * * 'I am not going to last long, and I want things fixed so Amy won't have to bother about them.' * * * That she had been a good faithful sister to her. She never could repay her."

Nellie Phifany, August, 1908:

"She told me Amy had been very good to her. She had made provision for her so she would be well provided for. * * * That she had given her a bill of sale of everything in the house."

Ella Vincent, when Amy was in Michigan:

"She was lonely without her and wanted her to home with her. * * * She did not know what she would do without her."

### Augusta Truman, July, 1906:

"She said she had, she called it the Fairbanks farm, that was she said she deeded to Amy * * * 'I shall leave the home and everything in it to Amy.'"

### In 1908:

"She had deeded the house and lot to her where they were living. 'You know Amy has stood by me when I am sick, * * * I do not feel that I could do enough for her.'"

### Mrs. Godfrey, after illness of 1905:

"Amy took such good care of her. * * * 'Have made arrangements to take care of her while she lives.'"

### Myra Vedder, 1907:

"She liked her sister Amy's care. * * * She had provided for Amy. * * * Liked to have her take care of her better than the nurse."

The written expressions of regard from Mrs. Crumb for her sister Amy are contained in letters to different people. A few quotations will indicate their tenor.

### Letter to brother De Volson, September, 1905:

"I have been such a care night and day I have worn her (Amy) out. * * * Amy is doctoring. I am afraid she will give out entirely."

### December, 1905:

"She has to do all the work it makes it hard."

### January, 1906:

"I fell down once and Amy had all she could do was to get me up."

### Mrs. Truman, February, 1905:

"Amy is West. * * * When Amy gets home you can come and make us a long visit. I want you to come when Amy gets home."

### March, 1906, to her brother De Volson:

"My health is poor. * * * Amy has it very hard. * * * Amy will come out in August to see to setting her monument [referring to a sister who had died].

### August, 1907, to her brother De Volson:

"Amy keeps well, but has to work hard, has everything to do and me to look after."

In December, 1907, she wrote her brother De Volson, and speaking of her brother-in-law whom she said wanted Anna Russell's home sold, and that Amy had some words with him:

"At last I told him he might as well dry up it wouldnt never be sold until Marian was 21 years old I said it was the first home they had ever had and my money bought it he had nothing to do with it."

### March, 1908:

"What would I do if anything should happen to Amy, she takes care of me night and day."

### May, 1908:

"Amy looks after me like a baby and she isnt well."

March, 1908:

"Amy is making me some chicken broth what would I do without her."

September, 1905, she wrote Mr. Seamans, in which she speaks of the sickness of her sister Addie, that:

"Since she commenced to write the letter she had a message that Will Culver dropped dead with heart trouble, that Amy would go out there (Michigan) and start Monday."

June, 1906, to Seamans:

"We received the clover seed all right it is sewed and out of the ground. Many thanks for the same until you are better paid."

Speaks of chicken dinner with no one but herself and Amy to eat it. Writes about garden, and says:

"Amy keeps busy all the time."

March, 1908, she writes Mr. Seamans a long letter, where she goes into her brother De Volson's affairs, in which she tells how much money she has sent him, of the money she has invested for him, told him not to send De Volson any money until he heard from her again, says she thinks De Volson is putting too much money in his home; that if he was taken sick he would not have a dollar to fall back on. "I don't think he gives it a thought. If he does, he thinks he can write me as of yore when he gets in a tight place and I will send it; I hain't made of money." "He acts as if he thought we wanted to keep it. I do so he won't spend it and get down as poor as once was that he hadn't a coat to his back he thinks there is lots more to be divided up he said so to Amy when he was here she told him they were all disposed of."

March, 1908, to Seamans, after speaking of their health, and that she cannot see the lines:

"Now to business De Volson is bound to have the money to spend I cant see what his hurry is he cant do anything on his house this weather. * * * I wrote him last week and sent him $185.00, 100 principal on mortgage now he has had 1000 of principal he hasnt only 4 left out of five. * * * Wrote him when his principal was gone he wouldnt anything coming in and I had the use of enough money to take me through and wouldnt have any more 100 to hand out as of yore. * * * The 400 that he is bugling about 100 I took out of my own pocket to make it easier. * * * What did I do it for if it wasnt to help him. * * * He couldnt get any interest on it and as it was bearing interest * * * every dollar counted Oh I wish he had more of a head on him. I have said all I shall say you had better send it to him. let him get rid of it as quick as he can then he will be satisfied. * * * he will get to the end of his rope before he knows it he thinks when I am gone there is a lot to be divided and he is counting on for a share you know how that is. * * * I never had anything given to me but I have given away thousands of that I helped earn. * * * If I had to do it over I would let the law take its course God knows I have done the best I knew how and if there is one dissatisfied I cant help it I am afraid some of them will make Amy trouble you stand by her what would I do if it wasnt for her to take care of me. * * * I havnt anybody to go to but you if DeVolson was like anybody else he could helped lots you know he couldnt do as well as I could. * * * I hate Mary Jane for her extravagance she has got all she will get of mine."

April, 1908, to Seamans:

"You said you sent De Volson 416 that makes 723 since the first of Dec. there wont be any more until next Dec. ·* * * Hope he is satisfied to get read of it. * * * I told him was getting to be an old man and he hadnt never saved a dollar and it was to late for him to commence now he thinks there is lots to be divided yet. There not a dollar I have done what I thought was right I leave it to you and Amy to look after when I am no more your loving aunt I expect to be found fault with it was mine to do with as I pleased I shall be in my grave where I cant here it."

The contestants urge that the sentiments expressed by testatrix orally and in those letters both as to Amy and Ezra Seamans were prompted by family pride and the ties of family relationship; that she would not do otherwise; that notwithstanding that the attitude of Amy and Ezra had broken down her will power, that they had abused and robbed, as indicated by the Morgan letters and statements made to Mr. and Mrs. Howes, and others who called occasionally; that to those friends of social equality her proud spartan heart that loved on to the close would not stoop to utter a reflection upon those who had been the objects of her bounty, and a source of much solicitude. It is the irony of fate that those whom her will indicates were in her mind prompting her kind action should show her less respect in their deductions from the evidence of the one weakness in her character; that those objects of her bounty should now use that which she left them, through able counsel, to further blacken her character, to argue to the world that she was cowardly, deceitful, and untruthful, covering up an intimacy dear to her, but unworthy to the family name. This causes one to harbor the thought that, if a small portion of what she left would wipe out the picture, it would have been withheld. The contestants are less considerate of Ezra Seamans than of Amy. They draw a picture which will bear close inspection before any flaw is detected in its execution. He becomes the owner of the farm and the house and lot she deeded to her brother Edward Smith. He appears upon the scene at the funeral of Mary Walker, the sister of Mrs. Crumb. He continues to appear at intervals, mostly when Mrs. Crumb is ill. He assumes control of her business. He is not a blood relation. Without apparent reason, he is made the confident and custodian of large sums of money to the exclusion of a blood nephew, an upright, honest, and able business man, living within 30 feet of her door. He procures the execution of transfer of about $12,000 in government and town bonds, and takes the money away. He refuses to speak to Mrs. Wiggins after she succeeded in getting into the house and room to see her sick sister. He, by his manners, assists in her exclusion from the sick chamber, so that she never saw her again during life. He camps on the trail of her malady, and is in at the finish. He procures the lawyer from away to draw her will. He stands over testatrix and witnesses while that which benefits him is being signed and sealed, and sees, with Amy's aid, that after that she is never alone where she can see any one with a strong arm who can ward off the ever overpowering will. They point to his attitude since her death as indicating his natural make-up and tendency before death, and say that undue influence and a fraud upon the old lady was exerted and committed. Conceding that this picture of Ezra Seamans is true to nature and to life,

and that the burden of proof is upon him to show it is not true, does it not prove the reverse of what is claimed for it by the contestants? The estate disposed of under this will is from $12,000 to $14,000, and he only got $1,604.27, as shown by the collateral inheritance tax assessed against the estate. Would that have been the sum total of his interest?

That Amy Smith, the sister, had influence with the testatrix, cannot be denied upon the evidence appearing in this record. The basis of that influence, it can be found from the record, was either love or fear, and it might have been both. Any influence based upon the affection which existed between these sisters would be proper, and the result of it should remain inviolate. If the letters to Morgan correctly represent her state of mind, then she feared this sister; but she still might have loved her, and the fear extend to the one circumstance which gave rise to such fear. That for the last few years of the life of Mrs. Crumb Amy prevented the further relation between her and Dr. Morgan is clearly deducible from the evidence. That she resorted to strong and drastic measures to accomplish her purpose in that regard will not be successfully urged to the contrary. The court does not deem Amy censurable for what she did. While it was not her concern, if she feared disgrace or improper squandering of money, she was well within her rights, considering the long time she had lived there, and her relation to the family, to intervene. One could hardly expect less, let her motive be what it may. The question and the only question that now seems to remain is, Did that influence unduly interfere with the desired disposition which Mrs. Crumb wanted to finally make of the property remaining to her on May 23, 1906? To determine this question we must leave behind for the moment the loves, the passions, and the prejudices of those interested in this contest, and follow the real life and actions of the testatrix in that part of her earthly journey, when common sense and judgment, if it exists, comes into operation.

We cannot do this unhampered by rules of conduct already crystalized into law by the appellate courts. In applying those rules to the evidence, we must keep in mind the part that Amy played or omitted to play in the life of this testatrix. In Matter of Seagrist, 1 App. Div. 615, 37 N. Y. Supp. 496, the court says:

"Those persons who occupy intimate and affectionate relations with any individual have the right, by personal request, by fair arguments, and even by decent importunities, to procure a will to be made. The fact that they have done so is no argument against the validity of the paper, provided these importunities do not proceed so far as to overpower the will of the testator and induce him to do the thing which he would not have done but for these importunities, and to substitute the will of the beneficiaries in the place of his own uncontrolled judgment. * * * If the result of the importunities is simply to cause the testator to act, and to convince him of the propriety of making the will in the way in which he finally does so make it, so that at last it is his own act and represents his own judgment, the will is nevertheless good."

The above case also holds:

"The same clearness of comprehension and ability of expression which is required to enable a man to enter into a contract need not exist to enable him to make a valid will."

This judgment was affirmed in 153 N. Y. 682, 48 N. E. 1107. The rule applicable where a confidential relation exists is stated in Matter of Spratt, 4 App. Div. 5, 38 N. Y. Supp. 329.

With these rules before us, we must review what the undisputed evidence shows: It will be unnecessary to go back many years for a starting point. As has been before observed, the testatrix was a widow with no children living. She received from her husband, by will and otherwise, property of the value of about $70,000. She was one of 11 children, of these four sisters, Jane Wiggins, Addie Culver, Mary Walker, and Amy Smith, and two brothers, Edward and De Volson Smith, seems to have been in intimate relation with Mrs. Crumb for many years. In the early '90's she commenced to dispose of this property. That she conceived a plan to give this property away and divide it between her favorite sisters, brothers, nephews, and nieces, reserving the use of real estate to herself during her life, cannot be denied. She assigned to her brother De Volson Smith mortgages and securities of the value of $5,000. Helped nephews in Michigan with money; to her brother Edward a farm and house and lot; to Reed Smith, a nephew, a farm; to Jennie Smith, a niece, a farm; Jane Wiggins, a sister, a farm and a 20-acre lot; to Samuel C. Wiggins, a farm and house and lot. This disposed of her real estate except a farm known as the Shube Brown or Fairbanks farm, in Cortland county, and the home place and a lot known as the "Lock-up lot," both in the village of De Ruyter. All of the above conveyances were made from 12 to 15 years before her death, the money given to her brother De Volson many years ago, and some money to Jane Wiggins many years before she died. This seemed to be the plan she proposed to follow in disposing of this fair-sized estate, and had been executed to the extent afore-mentioned down to the year 1906. The evidence shows that she intended to deed to her sister Amy the remaining real estate. Her other favorite sisters, Mrs. Culver and Mrs. Walker, had not had anything as a result of the plan conceived by her at the time of the first several conveyances and transfers referred to above. The sister Mary Walker lived near her at De Ruyter. She died in 1903. To trace further the working out of her preconceived plan, and one which to the extent of two-thirds of her fortune she had put into execution, we legally and properly have recourse to a former will executed by her. In October, 1904, she made a will, called in the record the "Wood Will," in that will she left to her sister Addie Culver $4,000, to Anna Reed, now Anna Russell, daughter and only child of her sister Mary Walker, $4,000, to Amy Smith she left her only household furnishings at the house, her jewelry, not disposed of, and property around the barn. In that will, as well as to the one under consideration, she left many legacies to collateral relatives. I do not refer to them here except to say that she seemed in each instance to remember and appreciate their relation to her, and it has been conceded that the questions of incompetency and undue influence could not be successfully urged, as against the Wood will. It will be noted that she makes no disposition of the real estate which still remained to her under this will. Such evidence as there is shows that she intended that real estate should go to Amy. Addie Culver died in February, 1906.

The testatrix then stated to several people, Dr. Coon, Ira Smith, Marvin Murray, and others, that she had to change her will on account of this sister's death. She had a legacy of $4,000 under the Wood will. The will in question was the next will, May, 1906. Before making this will, she deeded her remaining real estate to Amy Smith, also gave her a bill of sale of her personal property. These transfers she reaffirms in this will, and gave her one-half of the residue, amounting as before observed, to little over $1,600. The contestants urge that Amy exerted undue influence over the testatrix to procure this property, and they properly urge that the transfer of real estate and personal property conveyed and transferred shortly before making the will should be considered in connection with the making and execution of the will. It is urged that Ezra Seamans aided Amy in carrying out her purpose, that he procured the attorney to draw the will and consulted with him. His activities for one disinterested, as shown by the record in this case, are certainly marvelous; but, if they were exerted on behalf of Amy Smith, the inspiration must be somewhere beyond the realm of our present investigation. The instructions for drawing this will are concededly in the handwriting of the testatrix. While I do not consider that fact of much importance, yet they do show either she had mind enough to copy them legibly herself, or that they were her own composition and represented her views. In any event, some portion of the act was her own, and could not have been performed by another. Amy had from Mrs. Crumb $3,000. This represented, with her living from 20 to 25 years, of labor more or less, that she did work and care for Mrs. Crumb in her declining years, and that Mrs. Crumb intended to reward her in addition to the $3,000, I do not think can be otherwise inferred from this record. These years spent together as these women spent them, and they continued to the end, cemented ties that petty quarrels over Morgan could not tear asunder. Her very dependence upon Amy, which she seemed to appreciate and realize, could have no other effect than that of gratitude. Take that in connection with a plan conceived many years before her death, and which matured only with that death, is controlling in this case. No injustice is done the principal contestant. She had been bountifully favored when she needed it most. If it was not for this deliberate plan of disposition of her property in the early '90's, and the fidelity with which Mrs. Crumb followed it out, a very much different question would have been presented. While I am not satisfied that many of the circumstances so strikingly and forcibly brought out by contestants do not warrant a different conclusion as to them, I am satisfied, however, that upon the whole record, if I make an error, it must be in favor of the probate. A contrary decision would not square with my deductions from the evidence.

The proceedings to revoke probate are dismissed. Parties may come before me on eight days' notice, Monday or Friday, of any week, to settle findings for decree and upon the question of costs.