RUMSEY, J.
Nicholas Seagrist, a resident of the city of New York, died on the 14th day of April, 1894, after a sickness of a few days. He was a man between seventy and eighty years of age, who had, partly by inheritance, but much more by his own exertions, become possessed of an estate of over a quarter of a million of dollars. He was a bachelor, and for some years had lived with F. S. K. Sigrist and his wife, Theresa, who was a niece of the testator, but who had lived in his family for many years before her marriage. He had other collateral relatives, with some of whom, so far as appears, he was on friendly, but not intimate terms, and with some he was slightly acquainted. He was taken sick with diabetes on the 10th day of April. Before that time he had made no will. His disease progressed rapidly, and in a short time he became a very sick man. On the 14th of April his situation was serious, but even then his immediate death was not expected by anybody in his household, although the doctor in attendance upon him despaired of his life. The will was executed at between three and four o’clock on the afternoon of the 14th, and the testator died at midnight of that day. The will was propounded for probate in the usual way, and several of his next of kin appeared and entered upon a contest. The contestants made the usual allegations of want of testamentary capacity, and that the will was procured by fraud and undue influence of the principal devisee and that it was not properly executed. After a long trial, the surrogate admitted the will to probate, and from his decree to that effect this appeal is taken.
Upon the hearing before the surrogate there was practically no dispute as to what occurred at the time the will was made, nor is there the slightest reason to doubt that the story of what took place at the execution of the will by the proponents’ witnesses is substantially correct. It is quite true that they do not agree in all the details of the transaction, but it is a familiar experience that, where several witnesses are called upon to testify to the same transaction, there is apt to be some discrepancy as to the minor details of it. Indeed, if witnesses should agree as to every detail of a transaction which occupied a considerable space of time,- and should undertake to tell all that occurred in precisely the same order, each giving the same incidents as the others in precisely the same words, that fact would be, of itself, a suspicious circumstance. In re Lyddy’s Will, 24 St. Rep. 607.
The will was witnessed by five persons. That fact0is suggested as affording the presumption that all was not right, because it is not usual to produce so many witnesses to a will. Even if there were any force in this suggestion, it is removed by the proof of the fact that Nicholas Seagrist himself not infrequently drew wills for other people, and that, in superintending the execution of the will of his niece Theresa, he had procured five people to sign it as witnesses. The' fact itself is comparatively uniinportant, and the proof as to the manner in which his niece’s will was *90 executed is only material as tending to show a peculiarity of the testator which would give a reason why the husband of the niece, in preparing for the execution of his uncle’s will, should procure , the same num,ber of people to sign it as witnesses.
It seems, from the testimony, that the will was drawn by Mr. Orrell, a lawyer of many years’ experience, who had for a long time been an intimate friend of the testator. Just how he came to draw the will does not appear. The proponents propose to-show from whom he received his instructions. This was objected to by the contestants, and npon that objection the surrogate excluded it. The correctness of that ruling is not here in question, but the fact that the ruling was made, and the witness was thereby' rendered incompetent, for the purposes of this trial, to give evidence as to the person from whom he received instructions to draw the will, very la-rgely deprives of its force the objection that he, the only person who knew where the instructions came from, did-not testify to the fact. However, he was permitted to, and did, testify that he received no directions with regard to the the will from F. S. K. Seagrist, or from Theresa, his wife, who are the persons accused of practicing undue influence, and of procuring the will -to be drawn. Mr. Orrell did testify, however, that he had a long interview, lasting the greater part of a day, with Nicholas Seagrist; that, afterwards, he drew this will, and caused it to be engrossed; that on the 14th of April he took it to the house of the testator, who was then in bed, very ill; that it was read to him, and he understood it And then he describes, as did the witnesses to the will, what took place by way of execution of it. With regard to that, it is sufficienc to say that the formalities of the statute were in all respects complied with, and that the will was formally executed.
The will gives to Theresa Seagrist, the wife of Frank Seagrist, half of the testator’s estate. It appears, from the testimony, that Frank Seagrist and h'is wife were the only inmates of the house of the testator, except the servants, that they had lived with him for many years, and that their relations with him were affectionate and intimate; and the contestants insisted that they took advantage of this relation which they bore to the testator to induce him to make a will, when, if he had been left to himself, he would Have died intestate, and permitted his property to be distributed among all of his next of kin. To this contention there are two answers : In the first place, it is not even fairly to be inferred from the evidence that the'testator would not have made the will, if he had been left to his own devices. It is quite true that evidence was given on the part of the contestants, to the effect that he had, at various times, declared that he would never make a will; -but evidence was also offered, by the proponents, of declarations of.the testator with regard to his relations towards "Theresa, of the affection he bore to her, and evincing his intention that she'should have the larger part of his estate. So that all that can be inferred from the evidence,on that point, is that there were times during which he had no intention of making a will. In re White’s Will, 15 St. Rep. 753. But that evidence, itself, is of very slight im *91 portnnce. The will, as made, was a very natural one. His relationship to these persons who lived with him i.n the house was, as has been said, intimate and affectionate. Theresa Seagrist had been an inmate of his house before her marriage, and occupied almost the position of a daughter towards him. He had frequently expressed to many people the obligations he felt towards her for the kindness she had shown him, and it is evident she was the favorite among all his nephews and nieces. Some of these nephews and nieces, who lived elsewhere, were evidently not familiarly acquainted with him; and while his relations towards them all were friendly, and he sometimes visited them, it is quite clear, from the testimony, that he felt no particular affection for them, and neither had nor expressed any idea that he was under obligations to provide for them in any way. So that, in .view of the testator’s situation, as shown by the evidence, which is substantially uncontradicted, the intrinsic evidence that the -will was the product of his own intention and desire is very strong.
But, even "if he was procured to make a will in favor of Theresa, by her and her husband, that of itself is no proof of fraud or undue influence. Those persons who occupy intimate and affectionate relations with any individual have the right, by personal request, by fair argument, and even by decent importunities, to procure a will to be made. The fact that they have done so is no argument against the validity of the paper, provided these importunities do not proceed so far as to overpower the will of the testator, and induce him to do the thing which he would not have done but for these importunities, and to substitute- the will of the beneficiaries in the place of his own uncontrolled judgment. Parfitt v. Lawless, L. R. 2 ob. Div. 462; Tyler v. Gardiner, 35 N. Y. 559. If the result of the importunities is simply to cause the testator to act, and to convince him of the propriety of making the will in the way in which he finally does make it, so that, at the last, it is his own act, and represents his own judgment, the will is nevertheless good.
Giving all the weight which can be claimed for it to the fact that the beneficiaries were anxious that a will should be made, and procured Dr. Campbell to request the testator to do it, there is not one particle of undue influence. Nothing was said to Dr. Campbell by them, nor by him to the testator, as to the manner of will that should be made. All that was asked was that he should make a will; and when he concluded to make it, so far as 'appears, he had no communication with Theresa or her husband as to what his will should contain. It may be inferred that Frank Seagrist knew that a will was to be made, because it appears from his own testimony that he requested the witnesses to be present to execute it.; but there is not one particle of evidence that he or his wife spoke to the testator about it, nor did any more than follow directions in that regard, and it appears from the testimony that these directions, such as they were, were received from Mr. Orrell after his interview with the testator. Indeed, the case, upon the whole, is entirely barren of any evidence of undue influence. Neither is there any question but that the *92 testator knew the contents of this will. While there is no direct evidence on the subject, yet it is fair to infer, from what does appeal-, that he gave directions to Orrell about it, that Orrell drew the will as he was directed to do, that it was read over to him, and that he understood what there was in it.
The contestants insist that there was not sufficient proof that the testator was competent to make a will. This claim might be dismissed without any discussion, were it not for one or two exceptions to the rejection of evidence which appear in the case. The witnesses to his testamentary capacity were those who were present at the time of the making of the will.. From the story they tell, it is fairly to be inferred that, while the testator was exceedingly weak, and much nearer death than any of them anticipated, yet that he was in full possession of his faculties. The will was the result of an interview which had taken place before. At the time lie executed it, he knew the people who surrounded him, he was able to express his desires, and he understood the tiling that he was doing. The fact that a man is upon his deathbed when lie executes a will is, of course, no argument against its validity. The same clearness of comprehension and ability of expression which is required to enable a man to enter into a contract need not exist to enable him to make a valid will If it shall appear that, at the time the will was executed, he was possessed of sufficient comprehension to enable him to appreciate generally the extent of his property, to remember the persons who were dependent upon him, and to decide intelligently as to the propriety of his benefactions to them, the will which he makes is valid. 1 Jarm. Wills (5th Ed.) 38, note. The evidence offered by the proponents was sufficient, if believed, to warrant the surrogate in finding that the testator possessed this capacity. Indeed, there is nothing in the way of facts to contradict this evidence. The man was undoubtedly very weak. He was lying at the point of death, and his death followed, actually, within eight hours after the will was made. But, except in the excessive feebleness which accompanied such a physical condition, there is nothing to show that his mental condition was not as good at that time as it had been for some days before. There was some expert evidence offered as to what his menal condition must have been in view of the facts. But evidence of that kind, while it must be considered, ought not to overweigh the direct testimony of competent and disinterested people, who tell what the actual facts were.
It is not difficult, in any case, to frame a hypothetical question which, by putting forward one set of facts, and skillfully avoiding other facts, may bring out an answer which is favorable to the side of the counsel who frames the question. In framing such questions counsel are not called upon to state all the facts. The rule is that the question shall embrace no facts except such as may fairly be inferred from the evidence. If they obey that rule, counsel may frame their question in view of such facts as they see fit to include in it, provided, only, that the facts stated are fairly within the purview 'of the evidence. Dilleber v. Insur *93 ance Co., 87 N. Y. 79. So, when one is called upon to examine the weight to be given to an answer to a hypothetical question, it is necessary, in the first place, to see how accurately the question expresses the facts that have been made to appear. In this particular case, it cannot be said that the facts were unfairly stated. Neither can it be said that the question fully contained all the testimony. As was stated by one of the witnesses, he gave his opinion simply upon the facts which were presented to him, and he did not intend to give any opinion as to the actual condition of the testator, except as evidenced by these facts. However fairly a question of that kind may be framed, it must necessarily be incomplete in its presentation oí the facts; 'and for that reason the weight to be given to it must be considerably less than if the testifying witness had been familiar with the precise condition of the man whose capacity is the subject of examination, and gave an opinion based on that knowledge. Bearing in mind these considerations, it is fair to say that, upon- all the testimony, we think that the surrogate could have reached no other conclusion than that the testator, at the time of making this will, was fully possessed of testamentary capacity.
Many exceptions were taken to the rejection of evidence by the surrogate. These exceptions we have examined with considerable care. The rule in these cases is that the decree of a surrogate shall not be reversed for an error in admitting or rejecting evidence, unless it appears to the appellate court that exceptant was necessarily prejudiced thereby. Code Civ. Proc. § 2545. The court of appeals, in applying this rule, have held that, to justify a reversal, it must appear that, had the evidence which was rejected been received, the appellant’s case would not have failed, or that, without the improper evidence which was received, the respondent’s case was insufficient. Snyder v. Sherman, 88 N. Y. 656; In re Miner’s Will, 146 id. 121; 66 St. Rep. 265. Applying this principle to this case, we are quite clear that there was no reversible error in the rulings of the surrogate. We do not mean to be understood as holding that these rulings were not erroneous. It is sufficient to say that we have examined with care all of them which are relied upon here, and that, in our opinion, had the rulings been in every case such as were desired by the appellants, the result could not have been changed. The case made by the proponents was very strong, and that made by the contestants was very weak, and there is no aspect of this case, even considering all the testimony that was offered, by which a contrary result could have been reached. We have not omitted to consider what took place with relation to the execution of the satisfactions of the mortgages, or the conduct of Frank Seagrist after the will was executed, and up to the time that a temporary administrator was appointed. We are unable to gather from these facts anything which could throw any suspicion upon their motive or would warrant the inference that the will was not in all respects properly executed by a competent testator. Indeed, he seems to have appreciated all that was done at the time the mortgages were satisfied, which was after the execution of the will; *94 and, if any inference whatever is to be drawn from what took place there, it is that he thoroughly understood what he was doing. Upon the whole case, w.e are of the opinion that the decree of the surrogate must be affirmed.
This affirmance should be with costs against the contestants, and. these costs should be paid by the contestants personally, and not charged upon the estate. The award of costs in a case is made by way of indemnity to the successtul party. One who is entitled, to share in an estate is not indemnified in that regard, if he is compelled to give up part of the estate to pay himself for costs which other people have made in trying to take the estate away from him. Therefore, when the person trying to get the estate fails to secure it, it is a proper case, in our judgment, to require him to pay the cost of his unsuccessful attempt.
All concur.