In the Matter of the Probate of the Alleged Codicil of the Last Will and Testament of JOHN BOSSOM, Deceased.

ROSETTA KIMBALL, Individually and as Executrix, etc., of JOHN BOSSOM, Deceased, and JOHN BOSSOM, JR., Devisee and Legatee, Appellants; HENRY JOHN BOSSOM, Respondent.

Third Department, February 28, 1921. ·

Wills — probate — findings of lack of testamentary capacity and undue influence against weight of evidence — trial — contradicting party as witness — instruction that jury might consider failure of proponent to call doctor, third witness to will.

In a proceeding for the probate of a will and a codicil thereto, *held*, that findings of the jury that at the time of the execution of the codicil the testator was not of sound mind, memory and understanding and that the execution of said codicil was not the testator's free, unrestrained and voluntary act, were against the weight of the evidence.

A party to an action or proceeding who has gone on the stand may be contradicted and his credibility impaired by the evidence of witnesses called for that purpose without first putting the same question in form to the party.

The charge that the jury might consider the failure of the proponent to call a doctor, the third witness to the will, while not reversible error, is subject to criticism in that the jury should not be permitted to get the impression that the failure to call such witness would be proof of insanity of the testator; they should know that the statute requires but two witnesses and also that contestant could call such witness without making him his witness.

APPEAL by Rosetta Kimball, individually and as executrix, etc., and another, from a decree of the Surrogate's Court of the county of Broome, entered in the office of said surrogate on the 2d day of July, 1920, denying probate to a codicil made by John Bossom, deceased, to his last will and testament, after a trial by a jury of controverted questions of fact raised by objections to the probate of said codicil, and also from an order entered in said surrogate's office on the same day denying proponent's motion to set aside the verdict and for a new trial made upon the minutes.

*George W. Eisenhart* [*H. D. Hinman* of counsel], for the appellants.

*John Marcy, Jr.* [*Israel T. Deyo* of counsel], for the respondent.

KILEY, J.:

John Bossom, a resident of Binghamton, Broome county, N. Y., on the 6th day of March, 1902, made his will; at that time his family consisted of his wife, Catherine Bossom, to whom he left the use of his property, real and personal, during the term of her natural life; a son, Adam, $5; a son, John Bossom, $500. He then provided that the balance of his property should be divided into four equal shares, and the terms of its disposition was provided in said will as follows: One of said equal shares to his said son John; one to his daughter, Rosetta Kimball; one to a grandson, Henry John Bossom, contestant herein, and son of a deceased son of the testator; and the remaining one-fourth share to his said son John, as trustee for the benefit of his son Jacob Bossom during his natural life, and if any remained of the trust estate, at the time of the death of Jacob, it was to be divided equally between the said John and Rosetta aforesaid. Jacob was an incompetent person. The testator thus named and provided for all of his direct descendants living and the only representative of the one who had died. This family was German; the testator and his wife were born in Germany. The thrift and decent frugality, characteristic of that race, had, through the years that had gone before, netted this testator a property, consisting in the main of improved real estate, which produced an income sufficient for the needs of himself and his wife. It will be observed that this will is orderly, evenly arranged, and the result of a scheme, thought out by the testator, or at least so arranged as to benefit those he was to leave behind him, in equal degrees. The evidence shows that the son Adam, who had left home early, had been advanced sufficient so that the testator felt he was no longer to be considered in the division of his estate. John, upon whom was to fall the burden of his incompetent brother, was given an extra $500. The point is not that I am now passing upon any

claim that John Bossom did not make this will nor that he was not competent to make one, but the observation is made here to call attention to its orderly and intelligent construction along lines that denote a formulated and well-considered plan. I regard this as essential, in view of the conclusion I have reached. There came a time in 1914 when John Bossom decided to make a codicil to the will aforesaid. On May 28, 1914, he executed and published that codicil; the change it makes in the will is indicated as follows: " Whereas in and by my last Will and Testament, I did, in the third division of the third clause of said will, among other things provide as follows: ' One other portion I give and devise to my grandson, Henry John Bossom, of Syracuse, N. Y., to have and to hold the same for ever.' And whereas my said grandson, Henry John Bossom, has changed his mode of living since the making of said will, and seems to be in good circumstances and not particularly in need of funds, and whereas, my son, John Bossom, and my daughter, Rosetta Kimball, have remained in and about the City of Binghamton, New York, and have looked after and administered to the wants and comfort of myself and my wife, and rendered us valuable services without compensation, and I consider that said son and daughter are deserving of greater consideration than the other of my children, my son, Adam Bossom, having had his share of my estate long ago, Now, Therefore," etc. It must be evident from the record before us that these old people, both eighty years of age or thereabouts when this codicil was made, considered that this property which their undivided effort had accumulated belonged to them both, and Mrs. Bossom also made a will and a codicil thereto at the time the codicil in question was made. The wife, Catherine, died in July, 1914. John Bossom, the testator, died February 7, 1917. The will and codicil were presented for probate. The will was permitted to go to probate without objection. John Henry Bossom, the grandson, filed objections to the admission of the codicil to probate. Availing himself of the privilege conferred by section 2538 of the Code of Civil Procedure, he demanded a trial of the issues raised by his answer before a jury; an order to that effect was made and a trial was had. The issues tried were covered by six questions submitted to the jury,

which questions were agreed upon. A statement of these and the concessions made by the contestant's counsel after the judge's charge was delivered will show the issues without further quotation. *First.* It was conceded that the *evidence* justified an affirmative finding that the paper writing dated May 28, 1914, purporting to be a codicil to the last will and testament of John Bossom, deceased, was subscribed at the end thereof by him.

*Second.* It was conceded that the evidence justified an affirmative finding that said subscription by the testator; at the end of said codicil, was made by said testator in the presence of each of the other attesting witnesses and so acknowledged by him to said witnesses.

*Third.* It was conceded that the evidence justified an affirmative finding that at the time of making such subscription the testator declared said instrument so subscribed to be a codicil to his last will and testament.

*Fourth.* It was conceded that the evidence justified an affirmative finding that there were two attesting witnesses to said instrument, and that each of them signed his name at the end thereof at the request of the testator.

On the concessions so made by contestant the jury were directed to find affirmatively on each of the four questions as set forth above. These concessions and affirmative findings are to the effect that this codicil was executed and published in a legal manner and in compliance with the statute of this State. (See Decedent Estate Law, § 21.) This suggests the question here, which must always be answered in the negative: Can an insane person do a sane act? Of course a legal act is meant. However, passing that without answering it, the two other questions which were submitted to the jury and within the confines of which it was to consider the evidence, state all and the only issues raised by contestant's objections. They are as follows: "*Fifth.* Was the execution of said instrument by said testator his free, unrestrained and voluntary act? *Sixth.* Was the said testator at the time of the execution of said instrument of sound mind, memory and understanding?"

Those last two questions were answered by the jury in the negative, and upon such finding the surrogate entered a decree in the surrogate's office of Broome county, N. Y., denying

probate to the codicil. The proponent appeals from such decree to this court, urging three grounds why it should not be permitted to stand: *First*. That the finding of the jury is against the weight of evidence. *Second*. Error in the reception and rejection, and retention of evidence in the record. *Third*. Errors of the surrogate, prejudicial to proponent, when the case was submitted to the jury. Naturally, in the consideration of the questions submitted to the jury for its unlimited and undirected action, and upon which it found adversely to the proponent, the sixth question first suggests itself, viz.: Was this testator of sound mind, memory and understanding at the time he executed and published this codicil? We must start out with the understanding of the fact, crystallized into law, that the acts of the testator, with reference to the execution of the codicil, so far as covered by the first four questions submitted to the jury, were sane acts. This does not signify that such impetus as the affirmative holding on the first four questions may give to proponent's contention relieves them of difficulty; we must still consider the questions in the light of the evidence; and while it may be said, and practical experience and observation so advise us, that the fifth question is bound up with and involved, more or less, in the sixth. The rule is laid down for our guidance that " want of testamentary capacity and undue influence are distinct grounds on which a will may be impeached. One may be competent to make a will and yet under such restraint as to vitiate the instrument executed." (*Chambers* v. *Chambers*, 61 App. Div. 299.) It should be borne in mind that less capacity is required to enable a man to make a valid will than to enter into and make other valid contracts. (*Matter of Seagrist*, 1 App. Div. 615.) The reason for this rule is apparent; the will is not a contract; it usually represents the last wish, if not act, of the one departing; if it is attacked he is not here to defend his act or give a reason for it, so the court said early, in *Clapp* v. *Fullerton* (34 N. Y. 197): " The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust." Later the same

doctrine was affirmed. " A man's testamentary disposition of his property is not invalidated because its provisions are unequal, or unjust, or the result of passion, or of other unworthy or unjustifiable sentiments. It is natural and, therefore, usual to make provision for a child; but, under our governmental institutions, no obligation to do so is imposed upon the parent, and the presumption of validity is not affected by the failure to do so, alone. Nor is the presumption in favor of a will overcome by showing that the testator was of advanced age, or of enfeebled condition of mind or body." (*Dobie* v. *Armstrong*, 160 N. Y. 584.) To reach a correct conclusion on facts presenting the affirmative and the negative of conditions calling for such conclusion, rules for the consideration and interpretation of evidence were early formulated. The shortest and best that I have been able to find is found in *Delafield* v. *Parish* (25 N. Y. 9): " The testator [who] has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will," is a person of sound mind and memory within the meaning and intent of the Statute of Wills. The court charged, and contestant seems to rely on that rule as having been laid down by Judge DAVIES in *Delafield* v. *Parish* (*supra*), that the proponent had the burden of proving competency of the testator. The surrogate in *Dickie* v. *Van Vleck* (5 Redf. 286) directs our attention to page 97 of the opinion (25 N. Y.) where a majority of the court concur in the statement that the legal presumption is that every man is *compos mentis*, and the burden of proof rests on the party who alleges the lack of it; that he who alleges it must prove it. Of course, the whole evidence must show the testamentary capacity, even when it is not alleged. The surrogate is required to satisfy himself of that fact; but that is different from the conditions that prevail when mental capacity is made an issue; then the old rule holds. The best way to take up the evidence is as it was presented upon the trial. Under question 6 what evidence did contestant present of lack of testamentary capacity? One of the physicians who had treated him down to a short time before making this will was called. He said testator was an old man and was suffering with senile

dementia, which he said meant old age, or weakness incident to old age, hardening of the arteries, etc.; that on three occasions covering months of treatment he called at his office, several times in the night, and asked for medicine, which he (the doctor) had given him on the first occasion. The doctor says he had it in his mouth; the evidence shows the doctor accused his patient of having the tablets in his mouth, but it does not warrant anything further. Testator told him he had lost them, and the doctor found them in his pocket; that he came in his slippers and bathrobe in the night. I think the evidence shows that he never visited testator at his house but twice; that testator came to his office alone and unattended, except, the doctor says, a few times when a nurse came with him. This last is a mistake as it was shown by uncontradicted evidence that there was no nurse employed at testator's home. A woman worked there, Mrs. Bossom was sick, and the servant went to the doctor's office as and when directed by the testator. The intercourse between the physician and testator shows beyond cavil that the testator could not well be classed among insane persons. He settled his accounts, remembered from day to day the amount of his indebtedness and questioned charges that had escaped his memory; when he complained of pain he had pain and went to his physician for relief as often and at whatever time of day or night he felt he wanted relief from that pain. He never lost his way in the night nor the day. This testimony appears in the physician's evidence. I feel that his own evidence in favor of the testator rebuts and overwhelms any evidence he gave against him. The second doctor called by contestant was brief and decisive in his replies to questions. He had seen testator on the street for some time, off and on, before he called at his office. When he did call, he looked at his tongue, felt his pulse, and claims he could not get an intelligent answer to inquiries. The doctor pronounced his condition as one of insanity. He swears he made no further examination upon which to base his conclusion; that such conclusion was based upon the observation he thus made on a few visits made to his office by the testator. Some features the doctor could see without examination, viz., that the man was in his late seventies or early eighties; that he panted, more or

Third Department, February, 1921.     [Vol. 195.

less, from his exertion coming up to the second floor where his office was located, walked slowly, perhaps he was somewhat untidy; he did not answer questions readily. Two features present should not be overlooked, that this old man was a German and did not speak our language as fluently as others did; that he was at that time being treated by another physician for trouble in the head that pained him; he did not and probably did not intend to tell that fact to this physician; that he suffered pain and could not tell what it was nor its cause. The doctor's conclusion may be clear to his mind, but I must have the circumstances upon which it is based to a greater extent than here disclosed before I can reach the same conclusion. A lady testified that the testator called at one of his houses, then occupied by her, and said he was looking for his wife; this was after his wife died and some time after the will was made. The presumption does not follow that he was of unsound mind at the date previous when the will was made. Another lady testified about an occasion when she went to the house with her husband to rent a barn, and Mrs. Bossom said he was incapable of doing business, he was deaf and the lady says he did not hear what was said; it was not said in a loud voice. It cannot be concluded from that circumstance that he was insane. The other and only other incident calling for consideration, and advanced by contestant as a ground for disregarding this codicil, is what took place at the time instructions were given to the attorney for drawing the will. Mrs. Bossom said: " I want to give you all my property, I want to give it to you, and Mr. Bossom and I want to give it to you." He said: " Yes, we want to give you all our property, want to give it to you, and then when we are dead we want you to give it to Rosetta and John Bossom, Jr." In this proceeding one of the most sacred rights enjoyed by man in this nation, viz., the right to leave his property to those whom he wants to have it when he gets through, is assailed. He is not here to meet the assault. The most common instincts of intelligence and humanity suggest that a fair construction be given to what he did say; a construction that is logical, that makes for good rather than bad sense. To that end the fair construction of the position of the evidence quoted is had, if there is inserted after the words " I want to

give you," the words " a list of."  Such was what was meant, such was what was understood between the parties present. The evidence on the part of the proponent shows a picture not unfamiliar in the daily walks of life.  This German man and wife with a family, raised in frugality, reaches manhood and womanhood; all leave home but two, Rosetta and John, Jr. A third is stricken and is housed in an institution in or near his home city.  In 1902 this testator, weighing from 160 to 180 pounds, must have been a strong man, about sixty-eight years old, strong still with the confidence of youth; after seventy the decline must have been more rapid; he was living on the income from his property in these last years of his life; aside from his wife, there were but two that he could turn to in his joys and his sorrows, his son and his daughter; they had grown old with him; as they grew older together the circle of interest narrowed; they were thrown more upon, and became more dependent on each other. Mrs. Bossom was older than the testator; she became less strong, more often requiring increasing care.  Only this son and daughter, outside of the servant hired in 1914, made them intimate companions.  During all of these years the testator collected his rents, attended to taxes, repairs on his property, banked his money himself, drew it out as needed, kept his own accounts, paid his bills as they accrued, purchased the necessaries for the home, food, wood, everything needed in the household, helped care for his sick wife, wound clocks, filled stoves, carried out the ashes, went where duty or inclination called him unattended, conserved his resources.  When a bill or charge seemed to him exorbitant, he said so, they had to show him; when the attorney charged him ten dollars for drawing the papers at the time of the execution of the will, he told him it was too much, that it was all he had, and requested back a dollar, and got it; when being examined for a truss he inquired the expense, met it; all of this continued for years before, at the time of the execution of the will, and after until his last illness in 1917.  There seems to be no change except such as a steady growing old produces; its effect varies on different people.  I am struck with the ready significance of the remark of Judge RAPPALO in *Brick* v. *Brick* (66 N. Y. 144): " It would be indeed strange that a person should have the

capacity to acquire a large fortune by his personal industry and intelligence, and from causes existing at the same time be held not to have sufficient mental capacity to dispose of it by will." The learned surrogate charged that the proponent had the burden of proof on the question of testamentary capacity; proponent seems to have acquiesced. That is not the law, except in the light to which I have hereinbefore referred. (*Buchanan* v. *Belsey*, 65 App. Div. 58.) Taking either way here, the result must be the same. Contestant urges that lack of testamentary capacity can be predicated upon the fact that he was a natural object of testator's bounty, being a grandson, and, therefore, this codicil offends against the rule laid down in *Delafield* v. *Parish* (*supra*). All that case holds is that testator must know who is or might be the objects of his bounty; not that he must leave such persons his property; he may substitute the objects of his affection for the natural objects of his bounty; that is what was done in this case to the extent of changing the provision as to the contestant. Why not? Testator had not seen much of this man since he was a small boy. He was young and vigorous, holding a steady position. On the other hand, those who became closer with each passing hour were growing old with him. They were natural objects of his bounty in a nearer degree than contestant; in addition they were objects of his affection. I am satisfied that the verdict of the jury on the sixth question was error; that the evidence does not justify the finding that the testator was of unsound mind and memory when the codicil was executed. (*Horn* v. *Pullman*, 72 N. Y. 269; *Cheney* v. *Price*, 90 Hun, 238; *Calligan* v. *Haskell*, 143 App. Div. 574.) The fifth question, was the will the unrestrained and voluntary act of the testator, was answered in the negative by the jury. The restriction upon voluntary action is charged against the son and daughter, John, Jr., and Rosetta Kimball. It is urged that the lapse of time from making the will until the codicil was made indicates that influence was exerted to bring it about. That may be considered, but is not even presumptive. The evidence of any acts of undue influence is meager if not totally absent. The circumstantial evidence relied upon is the long and close relation and communication between father, mother,

son and daughter; the fact that the daughter, the mother and the father were together when a servant heard conversation about the contestant, to the effect that he had money, wore diamonds, was in the burlesque show business and had too much to do with women, and that testator said he should not have any of his money for that reason. It will be observed that this grandson did not have much in common with his old grandfather, and the fact that after he heard of the change in his grandmother's will he brought a stranger from New York to find out if he could what his grandfather had done of like nature with his will, indicates that his interest was not based wholly on affection springing from relationship. It was none of his business what the grandfather did with his own so long as he did that act freely and it was not the result of misrepresentation, deceitfully or maliciously made. The evidence does not warrant the holding that the attitude of the testator was the result of deceit maliciously practiced upon him by his son and daughter, nor does it justify the finding that the knowledge he had of the things he criticised can be traced to the son and daughter. Contestant admitted that he wore a diamond when he was at his grandfather's, that he told him that he was in the theater business, and from his own evidence it does appear that he had a lady there with him from New York. None of these matters are reprehensible, none of them indicate a lack of absolute respectability, none of them convince one that the life and living of this young man were not above reproach. The grandfather was undoubtedly mistaken in his conception of what those things may denote; from his knowledge of the theatrical business he undoubtedly caught the impression, common with many younger than he, that theatrical business meant easy money for little work, with a flavor to its operation, calculated to appeal to the lower curiosity of the masses; again the dress or undress of the performers, as he had observed them, did not appeal to his moderate, conservative nature. He had a right to entertain such a conception from anything he saw or heard, provided that conception was not the result of practiced fraud and deceit. The evidence in this record in that regard " is nebulous and when subjected to a scientific test, yields little in the way of positive content." The con-

clusion reached by the jury on question 5, submitted to them, cannot be sustained. It is against the weight of evidence. Undue influence must be proved; it cannot be assumed. (*Loder* v. *Whelpley*, 111 N. Y. 239, 250; *Rintelen* v. *Schaefer*, 158 App. Div. 477; *Matter of Murphy*, 41 id. 153.) In *Matter of Donohue* (97 App. Div. 205) the court says: "We should hesitate to find that undue influence has been practiced, * * * where a will is fair and reasonable, according to the common instincts of mankind, and such as might, with propriety and justice, be made by a decedent." (*Matter of Sullivan*, 229 N. Y. 440.) A present constraint must be shown; it cannot be surmised. (*Ivison* v. *Ivison*, 80 App. Div. 599; *Matter of Mondorf*, 110 N. Y. 450.) Such constraint must overpower the will of the testator. (*Matter of Snelling*, 136 N. Y. 515.) A person may use reasonable and legitimate argument; the undue influence must amount to coercion and duress. (*Smith* v. *Keller*, 205 N. Y. 39.) Having reached the conclusion that the decree of the learned surrogate and the verdict of the jury must be reversed, I could, with propriety, stop here. However, in view of the position taken by the attorneys in their briefs and by the learned surrogate, a few suggestions are not out of order. A party to an action or proceeding who has gone upon the stand may be contradicted, and his credibility impaired, by the evidence of witnesses called for that purpose, without first putting the same question (in form) to the party. The legatees named in the will could not testify upon this trial to any conversation or transaction involving a communication with the testator. (*Matter of Kindberg*, 207 N. Y. 220; *Griswold* v. *Hart*, 205 id. 384.) Many of the motions made by proponent to strike out evidence were subject to the criticism that appears in *People* v. *Chacon* (102 N. Y. 669). The charge of the learned surrogate that the jury might consider the failure of the proponent to call Dr. Knight, the third witness to the will, and duly excepted to, would not, in a case otherwise unassailable, reverse the verdict; however, such request and charge stand upon a different ground from that in other cases. The jury should not be permitted to get the impression that the failure to call such witness would be proof of insanity of the testator; they should know that the statute requires but two witnesses and also that contestant

could call such witness without making him his witness. (*Becker* v. *Koch,* 104 N. Y. 394.) Again, in the interest of justice both to the contestant and proponent, the learned surrogate could forestall such a situation, which might be extremely dangerous to a righteous party, by calling or insisting that the witness be called. The surrogate, in the last analysis, must determine whether the will shall be probated or not. (Code Civ. Proc. § 2614.)

The findings of the jury on questions 5 and 6 are disapproved, and the decree of the surrogate reversed and a new trial granted, with costs to abide the event.

All concur.

Decree of the surrogate reversed and new trial granted, with costs to appellant to abide event. The court disapproves of findings of fact numbered 5 and 6.