OPINION OF THE COURT
Marie M. Lambert, S.
In this proceeding to determine the validity of a charitable remainder unitrust, a hearing was held to determine whether the grantor was mentally competent to execute the trust. Petitioners, the decedent’s three children by a prior marriage, assert that the grantor suffered from a mental disorder which deprived him of the requisite capacity to understand the nature and consequences of the unitrust and the ability to exercise judgment with respect thereto. Respondent, the sur *1044 viving spouse who was married to decedent for seven years prior to his death, claims that the grantor understood the nature and consequences of creating a unitrust and that he was mentally competent at the time the unitrust was executed.
Decedent died on September 3, 1983 at the age of 78 survived by the petitioners and respondent herein. Under the terms of his probated will, dated May 15, 1978, the respondent received $125,000 and the shares of stock and proprietary lease representing ownership of their apartment. Specific legacies of $20,000 to $25,000 were bequeathed to testator’s sister and daughters-in-law, stepson, personal secretary and all individuals who, at the testator’s death, were employees for 20 years with his former law firm. The testator’s residuary estate was distributed in equal shares to his children. Testator’s wife and children were named as executors.
The trust in question was established on September 10, 1980 by the decedent and respondent with themselves as donors and trustees. The trust was funded with the bulk of the decedent’s assets including the townhouse in which he and the respondent lived. The trust contained a high percentage of non-income-producing property. The list of assets attached to the trust instrument contained a nonexistent securities account supposedly held at a brokerage house and office equipment not owned by the decedent. The unitrust instrument provided for an annual return of 7% of the fair market value of the trust. The trust remainder was divided equally among 16 named charities with whom the decedent had a long-term affiliation. These charities and the Attorney-General were cited in this proceeding and declined to participate. On November 21, 1980, the donors removed the assets placed in the trust and substituted in its stead an unsecured promissory note in the sum of two million dollars with interest at 10% per annum. It is uncontroverted that if the trust is valid, the decedent’s testamentary scheme would be severely impacted.
In December 1980, petitioners commenced a proceeding to have a conservator appointed for the decedent. Two court-appointed examining physicians and a guardian ad litem recommended that a conservator be appointed. In a report rendered to the court, one of the physicians, a psychiatrist, diagnosed the decedent as suffering from "primary degenerative dementia, senile onset”, which was characterized as a "senile psychosis”. That report was based on a review of medical records, letters and other documents executed by the *1045 decedent and a personal interview. It was the doctor’s impression that the decedent’s "temporal orientation was impaired; that his memory for recent events was spotty; that in his garrulousness, repetitiveness and circumlocutious, his ability to harness his intellectual faculties was damaged”. The doctor concluded that the "rapidity and progression of the disease differ greatly from case to case” but that certain actions taken by the decedent on March 24, 1980 indicated that he was not in full control of his faculties.
On June 20, 1981, the Supreme Court, New York County, determined that the grantor was substantially impaired and was unable to manage his property. Accordingly, respondent and an attorney were appointed coconservators of his property. Thereafter, the attorney coconservator moved to set aside the unitrust created by the decedent and respondent on the ground that there was an invalid delivery of decedent’s assets to the unitrust. Although it was determined by the Supreme Court that the trust as created was proper as to form, the court, sua sponte, raised the issue of whether the decedent was mentally competent to execute the trust. In view of the fact that this was not a basis upon which the coconservator sought to set aside the unitrust, the Supreme Court Justice denied the petition without prejudice to commencing a proceeding based on the issue of competence. Such a proceeding was commenced in the Supreme Court and was transferred to this court pursuant to a stipulation between the parties.
At the hearing held by this court, petitioners proffered testimony by several longtime friends of the decedent, two attorneys with whom he leased and shared office space, his personal secretary, his nephew, his personal physician, the administrative partner of the law firm of which he was previously a partner, an expert with respect to charitable remainder unitrusts, the guardian ad litem who was appointed to represent decedent in the conservatorship proceeding and a forensic psychiatrist. Respondent offered testimony by the decedent’s stepson, a tax professor, a husband and wife acquaintance of the decedent, the president of the decedent’s undergraduate alma mater, a college arts center director, a geriatric psychiatrist and the attorney who represented respondent in the probate and conservatorship proceedings.
A synopsis of the testimony indicates that it focused on the decedent’s conduct prior to the execution of the unitrust, his mental condition, behavior and physical demeanor at and *1046 around, the time the unitrust was executed and his understanding of the concept of the unitrust. Petitioners claim that the testimony shows that the decedent was suffering from primary degenerative dementia which is a form of organic mental syndrome and that this manifested itself in bizarre conduct during the spring of 1980. It is claimed that the disease sufficiently weakened his mind by September 10, 1980 so that he was unable to understand the nature and consequences of a unitrust and that he was unable to control his conduct to prevent himself from executing the unitrust.
Petitioners also claim that the decedent had an obsessional delusion with respect to unitrusts and that he spent his waking hours feverishly sending packets of materials to his friends and to charitable organizations with which he was associated in an attempt to coerce them into placing all their assets into a unitrust. In order to induce them to do so, petitioners claim that the decedent stated, inter alia, that a unitrust was suitable for everyone with a taxable income over $2,500, that a charity or municipality could benefit from placing their assets in a unitrust, that the United States Government would promptly pay in cash to an individual establishing a unitrust at least eight times the value of the assets placed in it and that because of his own unitrust, his estate would be increased significantly.
The respondent admits that the decedent suffered a serious turning point in his health in 1980 but dates that point from December 7, 1980, some three months after the unitrust was established. Respondent contends that the decedent, on September 10, 1980, was mentally competent to execute the unitrust in that he understood its nature and consequences and formed a considered judgment with respect to it. The respondent claims that the decedent’s attempts to induce others to form unitrusts was nothing more than a "sales pitch” from a man who worked with the concept of unitrusts for a long period of time.
Although there is no case which discusses the mental capacity necessary to execute a charitable remainder unitrust, it is well settled that courts will apply the governing standards for analogous transactions. (Bogert, Trusts and Trustees § 44 [2d ed rev].) Petitioners argue that the standard to be applied is one of contract. Respondent claims that the analogous standard is that of making a will — a standard which requires less capacity than the execution of any other legal instrument. (See, Matter of Coddington, 281 App Div 143, affd 307 NY 181; *1047 Matter of Bossom, 195 App Div 339; Matter of Seagrist, 1 App Div 615, affd 153 NY 682.) A will, by nature, is a unilateral disposition of property whose effect depends upon the happening of an event in futuro. A contract is a bilateral transaction in which an exchange of benefits, either present or deferred, is exchanged. A charitable remainder unitrust is a bilateral transaction between the settlor and trustee in which the settlor transfers a present interest in property in return for an annual fixed percentage of income based on the fair market value of the corpus (and a tax deduction). As such, it is more analogous to contract than to a will.
In Ortelere v Teachers’ Retirement Bd. (25 NY2d 196, 202), the Court of Appeals had occasion to review the standard of mental incapacity applicable to contracts. The court found that the traditional standard of measurement was largely a "cognitive test” in which the focus was on whether an individual could comprehend and understand the nature of the transaction. (Aldrich v Bailey, 132 NY 85, 89.) This test necessarily includes a requirement that an individual "be able to make a rational judgment concerning the particular transaction” (Ortelere v Teachers’ Retirement Bd., supra, p 203; Paine v Aldrich, 133 NY 544, 546). As noted by the Ortelere court, "it is also well recognized that contractual ability would be affected by insane delusions intimately related to the particular transaction” (Ortelere v Teachers’ Retirement Bd., supra, p 203; Moritz v Moritz, 153 App Div 147, affd 211 NY 580).
The Ortelere court, concerned that the traditional "cognitive test” failed to take into account those who were unable to control their conduct even though their cognitive ability seemed unimpaired, fashioned an additional test. This test, based upon Restatement (Second) of Contracts § 15 (1) (b) permits a contract to be voided where a person, "by reason of mental illness or defect” is "unable to act in a reasonable manner in relation to the transaction”. Thus, in New York, the test for contractual incapacity includes not only those who do not understand the nature and consequences of their actions, but those " 'whose contracts are merely uncontrolled reactions to their mental illness’ ” (Ortelere v Teachers’ Retirement Bd., supra, p 205).
A perusal of the testimony described previously indicates that the decedent lacked the capacity to execute a charitable remainder unitrust under either the cognitive or the impulse test. A fair reading of the evidence indicates that the decedent *1048 lacked capacity even if the standard of measurement was that of a will. The clear and convincing credible evidence shows that the decedent suffered insane delusions with respect to the nature and consequences of a charitable remainder unitrust and was, because of his mental condition, unable to control his conduct.
Any fair reading of the evidence shows that the decedent suffered from primary degenerative dementia, a psychosis, whose onset became pronounced in the spring of 1980. Although respondent avers that the court should subscribe little weight to the testimony of petitioners’ expert psychiatrist, the testimony rings true, particularly in light of the report of the court-appointed doctor in the conservatorship proceeding and the decedent’s treating physician. This conclusion is buttressed by a myriad of bizarre documents composed by the decedent and a sequence of abberrational behavior displayed by the decedent in the spring and summer of 1980.
While respondent would have this court believe that these actions were the workings of an eccentric mind, they were the reactions of a mind riddled with illness. Such an illness does not prevent an individual from functioning entirely but prevents one from functioning critically. The disease, whose rapidity and progression vary, eats away at judgmental ability and the ability to resist a judgment which is poorly conceived. Only this can explain the decedent’s fatal and flawed understanding of the concept of a unitrust and the consequences of establishing one.
It is uncontroverted that a unitrust is not a vehicle for everyone and that municipalities and charitable organizations gain no benefit by putting their money into one. It is also uncontroverted that the Federal Government, after a unitrust is established, does not make an immediate cash payment in multiples of the original investment. Further, the Internal Revenue Code provides for severe sanctions where a grantor/ trustee engages in self-dealing. While the respondent glosses over these and other misunderstandings as the product of an exuberant love of unitrusts, they represent thinking gone seriously awry.
So too, the court is unimpressed by the contention that the unitrust documents were inoffensive as to form and capable of qualifying for a charitable deduction under the Internal Reve *1049 nue Code. It is clear that the decedent, at one time, was a brilliant tax lawyer who had worked with the concept of unitrusts. The unitrust documents churned out by the decedent during the 1980’s were photocopy images of documents prepared by him when his mind was unclouded. As such, they represent nothing more than a Pavlovian response to an obsessional stimulus.
In addition, the disease narrows one’s mental focus until such time as one specific point becomes an intense preoccupation. Only this can explain the feverish pitch in which the decedent disseminated unitrust documents to unwilling customers and the threats to sue those who did not follow his advice. While the respondent would have this court believe that the decedent’s constant discussions about unitrusts were a mere "sales pitch”, they really reflected a deep-seated obsession which flowered in intensity as his mental illness progressively worsened.
Accordingly, petitioners’ application to declare the charitable remainder unitrust invalid as to the decedent is granted. No evidence was adduced which would also render it invalid as to the respondent.
Petitioners further request pursuant to SCPA 2301 (4) the imposition of the costs of this proceeding. Court denies petitioners’ request to recover the costs of three expert witnesses, transcript fees, subpoena fees and daily preparation expenses. Petitioners contend that respondent’s position is not meritorious and is responsible for the needless litigation of the within proceeding.
The award of costs is a matter which is within the discretion of the courts (SCPA 2301; Matter of Collins, 13 NY2d 194). Costs can be awarded against a losing party personally if it is shown that the individual interposes unfounded litigation against the decedent’s estate (Matter of Rourke, 2 Misc 2d 471).
In the within proceeding, respondent averred that the decedent had the requisite mental capacity to validly execute the September 10th unitrust. Respondent presented sufficient evidence to demonstrate a good-faith offer of proof. In view thereof, the court determines that costs should not be imposed upon the respondent personally.