■ In the Matter of the Estate of Kathi M. Obermeier, Deceased. George H. Holbrook, as Executor of Kathi M. Obermeier, Deceased, et al., Respondents; Frances Murphy, Appellant.—Kane, J. Appeal from an order of the Surrogate's Court of Rensselaer County (Ceresia, Jr., S.), entered April 27, 1988, which directed petitioner to sell certain real property owned by decedent to respondents Matthew Beck and Diane Beck.

On November 25, 1986, decedent, along with her husband, executed a contract for the sale of their farm located in the Town of Hoosick, Rensselaer County, to respondents Matthew Beck and Diane Beck. Shortly thereafter, but prior to closing, both decedent and her husband died. Decedent's husband predeceased her and she was left, as surviving tenant by the entirety, as the sole owner of the farm. This proceeding was then commenced by petitioner, as executor of decedent's estate, requesting an order directing the sale of the farm under

the terms of the November 25, 1986 contract. Respondent Frances Murphy, decedent's niece and one of the beneficiaries under decedent's will, objected on the ground that decedent was incompetent at the time of the contract's execution. A hearing was held and testimony taken after which Surrogate's Court ruled in petitioner's favor and ordered the sale of the property pursuant to the terms of the contract. This appeal by Murphy ensued.

Initially, we note that a person is presumed to be competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity (Matter of Gebauer, 79 Misc 2d 715, 719, affd 51 AD2d 643; 66 NY Jur 2d, Infants and Other Persons Under Legal Disability, § 109, at 316). Furthermore, the party challenging the action is required to establish incompetency at the time the action took place (see, Rattray v Huntting, 11 AD2d 785, appeal dismissed sub nom. Rattray v Raynor, 10 NY2d 494). In this case, Surrogate's Court concluded that the evidence presented as to decedent's alleged incompetency was insufficient to overcome the presumption of competency. We agree.

At the time the contract was executed, both decedent and her husband were in a nursing home. Decedent had been there for approximately two months. The Becks had been neighbors of decedent and she and her husband were Matthew Beck's godparents. Matthew and his father, Rudolph Beck, testified at the hearing that they visited decedent and her husband at the nursing home frequently and that on one of the visits, it was agreed that the farm would be sold to Matthew. Both Matthew and his father testified that on the day of signing the contract, they were present, as was Charles McNally, another friend of decedent and her husband. They also testified that at the time of signing, decedent was in possession of her faculties and was not confused. In contrast to this testimony, Brenda Morris, a nurse at the nursing home, testified that only McNally was present when the contract was executed. It should be noted, however, that Morris only observed the signing at a distance from her position at the nurse's station and she also stated that she did not hear any of the conversation at the time the contract was signed. She also testified that decedent at times did not know where she was or what time it was and that decedent was confused most of the time. Morris stated that decedent was suffering from dementia and was receiving medication designed to calm and sedate her. However, the nursing summary notes for the week

of November 25, 1986 indicate that decedent was confused "at times" and that she could be oriented "as needed". Morris also said that there were periods when decedent was not confused.

In our view, the evidence presented as to decedent's state of mind was concerned with her capacities in general and nothing in the record shows that at the time of signing she was incompetent *(see, Rattray v Huntting, supra)*. Nor was there any evidence as to the extent or duration of any mental deterioration at the time of signing *(see, supra)*. A physician who had treated decedent just prior to her admittance to the nursing home stated only that the medication could cause confusion and that at the time of his treatment, which had been approximately two months prior to the signing of the contract, decedent had been fully competent. Given these circumstances, the determination of Surrogate's Court that the presumption of competency had not been overcome was not against the weight of the credible evidence *(see, Trode v Omnetics, Inc.,* 106 AD2d 808) and should therefore be affirmed.

Order affirmed, without costs. Kane, Levine and Harvey, JJ., concur.

Mahoney, P. J., and Weiss, J., dissent and vote to reverse in a memorandum by Weiss, J. Weiss, J. (dissenting). We respectfully dissent. Since this case was tried before the court without a jury, we may weigh the evidence and grant judgment as the facts warrant *(see, Poerio v State of New York,* 144 AD2d 129, 130; *Saulpaugh v State of New York,* 132 AD2d 781, 782). In our view, the evidence presented as to decedent's mental capacity was sufficient to overcome the presumption of competency. This is not simply a case where the evidence of mental incapacity was general in nature. The testimony of Brenda Morris, the owner of the facility as well as its Director of Nursing Services, was actually keyed into the morning of November 25, 1986, the date the contract was executed *(cf., Rattray v Huntting,* 11 AD2d 785, *appeal dismissed sub nom. Rattray v Raynor,* 10 NY2d 494 [competency examination 21 months after operative date]). Morris spoke directly with the 85-year-old decedent during the morning and variously described her as disoriented, lacking in judgment and "confused most of the time". Morris further described decedent as suffering from "dementia", a mental impairment evidenced by confusion. As noted by the majority, decedent was also being treated with several medications designed to sedate her.

Even more disturbing are the variety of inconsistencies in this record, particularly as to the execution of the contract.

Specifically, Morris stated that decedent was alone in the hallway with Charles McNally when the contract was signed. This scenario sharply contradicts that of the Becks, who insisted they were present when the contract was signed in the open dining area. The discrepancy is heightened by the heavy emphasis that Surrogate's Court placed on the Becks' purported observations of decedent during the transaction. Morris also disputed the Becks' testimony that they routinely visited decedent. Moreover, even the Becks could not agree as to who initiated the whole transaction. According to Rudolph Beck, the Becks inquired first as to whether Matthew Beck could purchase the farm. Matthew, on the other hand, testified that decedent proposed the sale. Also troublesome is that the Becks commissioned an appraisal of the farm in advance of the contract, and yet insist decedent set the purchase price at $60,000. Notably, Frances Murphy's appraiser valued the farm at approximately $125,000, raising a further issue as to decedent's awareness. Although Surrogate's Court's assessment of the credibility issues is entitled to deference, we find these inconsistencies far too significant to ignore. In our view, the Becks' financial interest in the outcome of this litigation raises serious questions as to their credibility (see, Richardson, Evidence § 395, at 372 [Prince 10th ed]), especially since Surrogate's Court found "[t]he testimony of Rudolph and Matthew Beck * * * was the only testimony or evidence given to show the state of mind, and therefore enable the Court to determine the mental competency of [decedent] at the time the contract was signed".

Giving due regard to decedent's advanced age, her failing health, the medication factor, her lack of counsel and the poignant testimony of Morris, it is our view that decedent did not enjoy the mental capacity to execute the challenged contract (see, Restatement [Second] of Contracts §§ 12, 15 [1981]). This conclusion is perhaps best supported by Morris' testimony that decedent remained adamant about going home and retaining her house key even after the contract was signed. Accordingly, petitioner should be instructed to avoid the contract of sale.