OPINION OF THE COURT
Eve Preminger, S.
This bitterly contested dispute between the decedent’s widow and his sister, who is the executrix of his estate, turns on an issue frequently raised in this court, the decedent’s mental capacity. What is unusual here is that the challenged capacity is not decedent’s capacity to make a will, but whether he had the degree of understanding required to release his wife from their antenuptial agreement, in which she had waived her right to elect against his will. The authorities, which are replete with applications of the established rule with respect to testamentary capacity, are sparse as to the degree of mental capacity required for inter vivas activities that fall under the rubric of donative transfers, such as gifts, trusts and the type of transaction presently before the court.
The relevant facts are as follows: in 1978 the decedent Albert Goldberg married Alicia, at that time a citizen of Columbia, who was in the United States on a limited visa. Two days before their marriage they executed an antenuptial agreement which provided that Albert agreed to support Alicia and maintain her as his wife, that Albert’s burial and interment would be the responsibility of his sister Ethel Schuman (petitioner) and that the parties waived their statutory rights of election and intestate succession.
Albert, who was more than 30 years older than Alicia, continued to reside with his sister Ethel, to whom he did not reveal that he was married.
In June 1982 Albert suffered a heart attack and was admitted to New York Hospital where he suffered a second attack and a stroke, as a result of which he was in a coma for two weeks. He recovered sufficiently to be transferred to the Rusk Institute of Rehabilitation Medicine for physical therapy on August 9, 1982, and remained there until the end of October. His treating physician diagnosed Albert as suffering from organic brain syndrome related to the stroke.
While at Rusk, on the evening of September 13, 1982, an attorney (Mr. Velardi) sitting at Albert’s bedside drafted a handwritten instrument entitled "The voiding of the antenuptial agreement made by the parties-executed before their marriage”, on a yellow legal pad. The instrument voided the *562 Goldbergs’ antenuptial agreement in its entirety, referring specifically to its elective share waiver. Albert and Alicia signed and acknowledged this document. In addition, the draftsman had each of the spouses sign a sentence he wrote at the foot of Alicia’s duplicate original of the antenuptial agreement, stating that they declared it to be void, which was also acknowledged.
Albert’s last will, executed in 1983 and admitted to probate in this court, disinherits Alicia in favor of the nephews who came to live with him as children after their father died. Alicia served a notice of election and the executrix instituted this proceeding for a determination of its validity.
A hearing was held before the chief court attorney to determine whether the revocation agreement fails on the grounds of lack of mental capacity or undue influence. Both parties agreed that the decision would be rendered by the court without the circulation or filing of a Referee’s report.
Mr. Velardi, the attorney, testified that his first involvement with Albert or Alicia was an August 1982 telephone call from Alicia, who got his name from a mutual friend. She requested assistance for her husband to revoke an antenuptial agreement. The attorney advised Alicia, and then Albert when he telephoned and repeated the request, that Albert should speak to his own lawyer. When Albert said he couldn’t get in touch with his own lawyer, the witness attempted to do so. Several conversations ensued and Albert eventually prevailed upon Velardi to visit him at Rusk.
Velardi had Alicia leave the hospital room during his first meeting with Albert, which took place toward the end of August at about 8:30 p.m. Albert repeated his desire to cancel the antenuptial agreement because he had been very unfair to his wife. He was near tears, and stated that he loved his wife dearly. Nevertheless, Velardi refused his request and again advised Albert to speak to his own lawyer.
About a week later, Albert telephoned Velardi with the same request. Velardi agreed to another visit, which he made on September 13th. This time Alicia remained in the room at Albert’s direction. Decedent became very emotional and said that he didn’t know how long he was going to last, and Velardi finally agreed to represent him. Velardi testified that in all their conversations he thought Albert was extremely lucid and knew what he was doing. He stated that he never asked decedent whether he had a will, or advised him that he *563 could simply execute a will providing for Alicia, in lieu of revoking the antenuptial agreement. He did ask Albert who his closest relatives were, to which decedent responded that he had a sister. He never inquired of Albert regarding the nature and extent of his assets, but recalled that decedent told him he understood Alicia would be entitled to share in his estate.
The medical evidence on decedent’s cognitive functioning was inconclusive. Dr. Grynbaum, decedent’s treating physician, testified that the organic brain syndrome did not leave Albert totally lacking in mental capacity but left him unable intellectually to foresee the ultimate consequences of his acts. It was his opinion that Albert could make some decisions but not decisions which involved sums of money beyond $10,000 or had long-range implications. The doctor had no notes or recollection with regard to Albert’s actual condition on the evening in question.
Dr. Grynbaum had called in an attending psychiatrist, Dr. Peter Kim, to treat Albert’s depressed state. Dr. Kim was unavailable to testify, but over objection, the court received his prior testimony in a Federal case (the Teledyne case) involving a claim by a judgment creditor against the estate and Alicia. Since the estate had full opportunity to examine Dr. Kim in Teledyne, and took the same position in that case, i.e., that the decedent lacked mental capacity during the same time period, his testimony is clearly admissible here on the question of Albert’s general cognitive capacity, even though Teledyne involved a different transaction. (CPLR 4517.)
Dr. Kim testified that he began treating Albert in mid-August and continued until his discharge from Rusk on October 24th. He stated that the organic brain syndrome which afflicted Albert affects the cognizant functions. Dr. Kim indicated that a lasting symptom of organic brain syndrome (OBS) is a labile affect, meaning that the person has wide mood swings which are vastly disproportionate to the circumstances.
It was Dr. Kim’s opinion that Albert suffered from some cognitive dysfunction throughout his stay at Rusk. He defined cognition as the human mental function which is responsible for "executing, perceiving and processing information, in other words a person’s thinking capability.” With respect to Albert’s general level of cognition, Dr. Kim stated that during the day he had a fair proportion of capacity to understand "Unitarian simple events”, while at night it fluctuated. Dr. Kim stated that a transfer which dealt with a substantial sum *564 of money, or involved more complex issues required greater judgment capacity but he did not rule out Albert’s capacity to understand such a transaction.
Dr. Kim testified that on August 23rd he had witnessed a bank transfer by Albert to Alicia involving about $9,000 and that Albert understood the transaction. The doctor also testified that on September 21st he had been present at a meeting with Albert, Alicia and Ethel to discuss Albert’s concerns about a large sum of money being held by Ethel which he wanted in his account. As a result of the meeting Ethel agreed to transfer the money to Albert.
Dr. Kim saw Albert on September 13th, the date of the revocation agreement. His note in the hospital record for that day says "no overt organic signs”.
The psychiatrist (Dr. Praver) called by Alicia as an expert witness gave his opinion that the decedent was competent. Dr. Praver had never examined the decedent. (See, Matter of Vukich, 53 AD2d 1029, affd 43 NY2d 668; Matter of Slade, 106 AD2d 914, 915 [describing such expert testimony as the "weakest and most unreliable kind of evidence”].) However, he explained why the surrounding circumstances, including Velardi’s caution and decedent’s repeated requests, demonstrated that the execution of the revocation agreement could not be categorized as an impulsive act.
The rest of the hearing testimony from the widow, the sister, and another lawyer shed little light on Albert’s emotional and intellectual capacity. The only question raised by this record is whether the organic brain impairment related to his stroke, coupled with his lengthy illness and hospital stay, deprived him of the capacity to execute the revocation agreement.
Was Albert Goldberg able to make a rational judgment concerning the advisability of releasing Alicia from her waiver of the spousal right of election? What degree of understanding is required for such a transaction? Alicia contends that the controlling standard should be identical to testamentary capacity. It is hornbook law that less mental capacity is required to execute a will than any other legal instrument. The reasons for this lower standard stem from the concept of a will as the testator’s last act, and from considerations of fairness which militate against depriving elderly or infirm testators of the right to dispose of their property. (See, Radigan, Attorneys Are Alerted to Take Early Precautions To Avoid Will Contests in *565 Sensitive Situations, NYLJ, Apr. 20, 1981, at 3, col 1; Matter of Bossom, 195 App Div 339, 343; Matter of Seagrist, 1 App Div 615, 620, affd 153 NY 682.) Additionally a will is not the product of a bilateral transaction between putative antagonists and does not require the sharpness of mind of persons involved in a business transaction. (Supra.)
In the main, these considerations do not apply to antenuptial agreements or their revocation. Such documents are clearly bilateral and in an important way, affect the parties’ present rights. It is however true that these arguments relate only to inheritance rights and stem from a personal relationship where adequacy of consideration is not usually the issue.
A similar issue was presented in Matter of ACN (133 Misc 2d 1043), which was the first New York case on the standard of capacity required to create an inter vivas trust. ACN applied the higher, contract standard of mental capacity, citing Ortelere v Teachers’ Retirement Bd. (25 NY2d 196), the leading case on the contract standard, relied upon by both parties here.
The traditional contract standard of capacity is a cognitive test, which focuses on whether the person was able to understand the nature and consequences of a transaction and make a rational judgment concerning it (Ortelere v Teachers’ Retirement Bd., supra). In ACN (supra) the decedent had executed a trust agreement creating a charitable remainder trust with himself and his wife as trustees of the bulk of his property. The spouses were to be life beneficiaries of an annual percentage of the value of the trust principle. The court relied on the bilateral character of the transaction and the fact that a present property interest was surrendered in exchange for the annual interest under the trust, in invoking the contract standard.
While the bilateral character of the trust in ACN (supra) could be viewed as largely a matter of form, Albert’s revocation of the antenuptial agreement represented the surrender of his testamentary freedom in response to his wife’s future needs. Since such a transaction requires sufficient mental capacity to evaluate another person’s claims as well as one’s own interests, and involves the making of an irrevocable decision, it calls for the degree of understanding required in the contract sphere. Accordingly, the court will apply the higher standard in evaluating Albert’s capacity.
ACN and Ortelere (supra) involved individuals whose intel *566 lectual capacities were severely impaired by psychosis or insane delusions. In Ortelere the person whose mental capacity was challenged was able to understand the nature and consequences of a transaction and intellectually able to make a rational judgment concerning it. The court nevertheless ruled that she lacked contractual capacity because she was in the grip of a psychosis which left her unable to use her intellectual faculties in a reasonable manner. There is no evidence that Albert Goldberg suffered from any psychosis which drastically interfered with his reasoning process. The issue is solely whether he had sufficient understanding to make a rational judgment with regard to the revocation agreement.
The burden of proving incapacity is on the estate which asserts it. (Matter of Obermeier, 150 AD2d 863; Restatement [Second] of Contracts § 18C, comment c [Tent Drafts Nos. 1-7, 1972].) Although Dr. Grynbaum opined that Albert lacked capacity to make significant change in his dispositive plan, the evaluation of the significance of Albert’s change of plan, and of the degree of understanding required therefor are legal, not medical questions.
The revocation was not a complex transaction. Albert clearly comprehended that the antenuptial agreement deprived Alicia of inheritance rights she would otherwise have as his wife. He understood that he wished to reverse this situation, which is the essence of the revocation.
Another significant factor in assessing the capacity of a person with some deficiency is whether he has independent advice. A seminal article on proof of incapacity suggests that the law should be slower to overturn transactions where the alleged incompetent was guided by a person who gave him protection and advice. (Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale LJ 271.) Here Albert had counsel who undertook to provide professional advice, and was satisfied that Mr. Goldberg understood what he was doing.
The critical consideration in determining whether the capacity standard has been met in cases where a person has some understanding of a particular transaction, but has a mental deficit is "whether the transaction in its result is one which a reasonably competent person might have made.” (Restatement, op. cit., comment b; see, Green, op. cit., 53 Yale LJ 271.) This court is not prepared to say that a reasonably competent husband might not, under the circumstances here, *567 revoke the antenuptial agreement. Of course Albert’s personal financial interests would have been better protected if he had simply signed a will leaving a significant bequest to Alicia. However his lawyer did not offer him this choice. There is a strong public policy in favor of spouses. The decision to restore a spouse to the protected situation which the law provides cannot be characterized as an abnormal departure from reasonable behavior.
Velardi’s testimony that Albert knew he was removing a barrier to his wife’s entitlement is convincing. The fact that Albert persisted in reaching out to the attorney to cure an injustice to Alicia, that he knew that Alicia was being given a share in his estate, and that he discussed this desire with Velardi in person on two separate occasions demonstrates that he possessed sufficient understanding for this uncomplicated act. The estate has not met its burden of demonstrating that Albert did not understand the nature of this transaction.
In addition to challenging the decedent’s mental capacity, the estate also challenged the revocation as having been procured by Alicia’s undue influence. The court finds no evidence that undue influence was exercised here. Mere motive and opportunity to exercise such influence is not sufficient (Matter of Walther; 6 NY2d 49).